Plymouth District Court
No. 2002-792

THE STATE OF NEW HAMPSHIRE

v.

CHRISTOPHER J. MCKEOWN

Argued: February 4, 2004
Opinion Issued: May 27, 2004

*Peter W. Heed,* attorney general (*Robert S. Carey,* assistant attorney general, on the brief and orally), for the State.

*Christopher J. McKeown,* by brief and orally, *pro se.*

NADEAU, J. Following a bench trial in Plymouth District Court (*Samaha,* J.), the defendant, Christopher J. McKeown, was found guilty of failing to have a personal flotation device (PFD) on board his kayak. N.H. ADMIN. RULES, Saf-C 403.01 (Rule 403.01); *see* RSA 270:11 (1999). On appeal, he argues that the district court erroneously denied his motion to suppress evidence based upon a stop in violation of the department of safety's standard operating procedure (SOP) 2010. We vacate and remand.

The record supports the following facts. On the afternoon of August 31, 2002, Officer Wesley Cook of the New Hampshire Marine Patrol was on duty on Squam Lake. Officer Cook observed a number of canoes, water bikes and kayaks in the northwest end of the lake. In order to conduct PFD checks of those boats, he piloted his marked patrol boat a quarter of a mile to where the defendant was sitting in his kayak, talking to another boater. When he was fifty feet away from the defendant, the officer held up a life jacket and asked to see the defendant's life jacket. Officer Cook testified that, when he performs PFD checks, it is his practice to "pull over" after he has waited for the boater to show that he does not have or cannot find his PFD. Here, however, the defendant's kayak tipped over, at least in part from Officer Cook's wake, while he was searching for a lifejacket. While he was in the water, the defendant indicated that he did not have a life jacket. Officer Cook assisted the defendant in turning over and draining his kayak, issued him a summons for not having a PFD, and escorted him back to his dock.

During trial, the defendant moved to suppress the evidence, alleging that there was no articulable suspicion for the stop, and, thus, the stop violated SOP 2010. The trial court denied the motion and the defendant was subsequently convicted. This appeal followed.

The defendant first argues that Officer Cook's routine PFD check was a stop that violated SOP 2010 because the officer lacked articulable suspicion. The State argues that the defendant's encounter with Officer Cook was not a stop requiring articulable suspicion because a reasonable person in the defendant's position "would have believed he was free to leave at all times." Because we hold that the defendant was stopped in violation of SOP 2010, we need not address the other issues raised by the defendant.

In reviewing the trial court's ruling, we accept its factual findings unless they lack support in the record or are clearly erroneous. *State v. Wallace*, 146 N.H. 146, 148 (2001). The determination of whether the defendant was stopped is a question of law that we review *de novo. Id.*

As a threshold matter, we note that rules and regulations promulgated by administrative agencies under a valid delegation of authority have the force and effect of laws. *Opinion of the Justices*, 121 N.H. 552, 559 (1981). For the purposes of our analysis here, we assume that SOP 2010 is an administrative rule because the State did not challenge the defendant's characterization of it as such. Thus, we will assume that it has the force and effect of law.

SOP 2010 requires that "Marine Patrol Officers must operate in a uniform manner, consistent with applicable statutes and case law in conducting routine operations relating to stopping and detaining boaters on public waters." The SOP instructs officers that "boats shall not be stopped on the public waters for purely discretionary reasons." It further provides, in relevant part, that "[t]here must exist in the opinion of the Marine Patrol Officer, at a minimum, an articulable suspicion that the operator, or other occupant of the boat is in violation of some criminal or boating law, rule, or regulation; ... or that the boat lacks the required safety equipment." As defined by the SOP, articulable suspicion includes, but is not limited to, "visual, audible, tactile, or other sensations experienced by the officer, which give rise to an apprehension on the officer's part, that the conditions" set forth above exist.

Because the language of the SOP mirrors our analysis for investigatory stops, we look to case law for guidance in analyzing whether the officer's actions prior to the defendant's response amounted to a stop in violation of SOP 2010.

A stop has occurred "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quotation omitted). "The proper inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *United States v. Drayton*, 536 U.S. 194, 202 (2002) (quotation omitted). Thus, a stop has not occurred when "a reasonable person would feel free to disregard the police and go about his business." *Bostick*, 501 U.S. at 434.

Here, the officer came directly toward the defendant's kayak in a marked patrol boat from a distance of at least a quarter of a mile away. When he was fifty feet from the defendant, the officer asked the defendant if he had a PFD. The actions of the officer, coupled with the officer's practice of waiting to determine whether a boater has a PFD, indicate that

the defendant's compliance with the officer's questioning was mandatory and, thus, a reasonable person would not "feel free to decline the [officer's] request or otherwise terminate the encounter." *Drayton*, 536 U.S. at 202; *compare State v. Quezada*, 141 N.H. 258, 260 (1996) (holding that the officer's action of shouting "Hey, you, stop," indicated that compliance was not optional and, when viewed with the other circumstances of the case, the defendant was seized) *with Com. v. Thomas*, 708 N.E.2d 669, 672 (Mass. 1999) (holding that because the defendant was free to terminate the interview, no seizure occurred when officer approached the defendant on a public street and asked him for his name and address). Therefore, we are persuaded that in view of all the circumstances in this case, this encounter transcended a mere request to communicate, and constituted a stop. *See Quezada*, 141 N.H. 260.

■ Having found that the defendant was stopped, we must next determine whether the stop for a PFD check violated SOP 2010.

SOP 2010 requires that "[t]here must exist in the opinion of the Marine Patrol Officer, at a minimum, an articulable suspicion that the operator, or other occupant of the boat is in violation of some criminal or boating law, rule, or regulation; ... or that the boat lacks the required safety equipment."

Here, the State conceded that Officer Cook did not have articulable suspicion. Accordingly, the stop violated SOP 2010, and we remand for further proceedings consistent with this opinion.

*Vacated and remanded.*

DALIANIS and DUGGAN, JJ., concurred; BRODERICK, J., dissented.

BRODERICK, J., dissenting. Because I disagree with the majority that Officer Cook "stopped" the defendant when he held up a personal flotation device (PFD) and asked to see the defendant's, I respectfully dissent.

At trial, the defendant, Christopher J. McKeown, moved to suppress evidence based upon an alleged illegal stop by Officer Cook of the New Hampshire Marine Patrol, contending that the officer lacked articulable suspicion as required by the marine patrol bureau's standard operating procedure (SOP) 2010. The trial court denied the motion and found the defendant guilty of failing to have a PFD, *see* RSA 270:11 (1999); N.H. ADMIN. RULES, Saf-C 403.01.

The record supports the following. In mid-afternoon on Saturday, August 31, 2002, during the Labor Day weekend, Officer Cook was in his marked patrol boat on a routine patrol of Squam Lake. His attention was drawn to the northwest end of the lake, where he observed "quite a few canoes, water bikes, kayaks; a lot of activity in the area." Although he was

not certain, Officer Cook estimated that there were "20 or 25" watercraft in the area. Officer Cook testified that he piloted his boat toward the area of activity with the intention "to monitor the boating activity for safe operation" and to "check all those vessels for life jackets." He testified that when he first spotted the defendant and his brother, they were talking with one another, while sitting in separate kayaks pointing in different directions. Further, Officer Cook testified that he was "probably 50 feet away" from the defendant's kayak and traveling "below headway speed . . . just barely putting along, because of the proximity of the other vessels," when he held up a PFD and asked if the defendant could show him his PFD.

After Officer Cook asked to see the defendant's PFD, the defendant's kayak overturned. By the time the defendant first indicated that he did not have a PFD, he was in the water. At that point, Officer Cook approached to assist. He subsequently issued the defendant a summons and escorted him back to his dock.

Although it is uncertain why the defendant's kayak overturned, the definitive cause is not at issue, nor is it of any import, in this case. The defendant has made no argument, nor is there any evidence in the record, that he was either forced to answer Officer Cook's question because his kayak overturned, or that he was coerced into answering the question because Officer Cook refused to assist him until he answered.

The majority opinion recites that "the officer came directly toward the defendant's kayak in a marked patrol boat from a distance of at least a quarter of a mile away. When he was fifty feet from the defendant, the officer asked the defendant if he had a PFD. The actions of the officer, coupled with the officer's practice of waiting to determine whether a boater has a PFD, indicate that the defendant's compliance with the officer's questioning was mandatory and, thus, a reasonable person would not 'feel free to decline the [officer's] request or otherwise terminate the encounter.'" Further, citing *State v. Quezada*, 141 N.H. 258, 260 (1996), the majority concludes that "in view of all the circumstances in this case, this encounter transcended a mere request to communicate, and constituted a stop." I disagree.

At trial, Officer Cook testified:

> When I—when I come by and I raise my life jacket, my fluorescent orange PFD, and the person doesn't either pull one out and do something, that gives me articulable suspicion that he doesn't have one on board or he can't find it. So I wait in time, I do not stop—I do not stop people, I drive by until they show that they don't have it. Or they can't find it. That's when I pull over.

Further, I believe the record to be inconsistent, at best, as to whether Officer Cook came directly toward the defendant's kayak to the exclusion of the other twenty to twenty-five watercraft in the northwest end of the lake. Officer Cook testified that he piloted his boat toward the "area" of activity with the intention to monitor the boating activity and to check all of the vessels in the area for PFDs. Officer Cook further testified, "Through our training, we are required to check everyone that we can. If there's a kayak or a canoe in the rocks and I'm across the lake, I'm not going to go darting across the lake to check on a kayak or canoe. But in a general operating patrol area, if we encounter one, we are to check for safety equipment." The defendant testified that "Officer Cook came at us." He further offered an affidavit from his brother stating that Officer Cook "did come ... straight for us," but the trial court did not admit the affidavit. Instead, the court took into account that "as an offer of proof, that ... contrary to what this officer has testified, he came straight for you."

I fail to see how, under the circumstances of this case and prior to when the defendant first indicated that he did not have a PFD, Officer Cook's "actions" constituted a "stop." I agree with the State that there was no seizure in this case until after the defendant indicated that he did not have a PFD, thus giving Officer Cook a reasonable articulable suspicion that he had violated the regulation requiring that he have one.

In *United States v. Mendenhall*, the Supreme Court stated:

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980) (opinion of Stewart, J.) (footnote and citations omitted). In *State v. Riley*, we adopted the objective test detailed in *Mendenhall* and noted that the *Mendenhall* factors are viewed by an objective standard, and not the asserted subjective beliefs of the particular participants in the encounter. *State v.*

*Riley*, 126 N.H. 257, 262-63 (1985). In addition, we noted with approval the words of the Supreme Court in *Florida v. Royer*, 460 U.S. 491, 497 (1983):

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, or by putting questions to him if the person is willing to listen.

*Riley*, 126 N.H. at 263 (quotation, brackets, and ellipsis omitted); *see United States v. Drayton*, 536 U.S. 194, 200 (2002).

The majority cites to *Drayton* and *State v. Quezada*, 141 N.H. 258 (1996), in support of its conclusion that, here, the defendant's compliance with Officer Cook's questioning was mandatory and, thus, a reasonable person would not feel free to decline the officer's request or otherwise terminate the encounter. I disagree.

In *Drayton*, the defendants were two passengers on a bus enroute from Florida to Michigan. During a scheduled stop, and after the bus was refueled and cleaned, all of the passengers reboarded. The driver then allowed three police officers to board as part of a routine drug and weapons interdiction effort. The three officers were dressed in plain clothes and carried concealed weapons and visible badges. *Drayton*, 536 U.S. at 197. Once aboard, one of the officers knelt on the driver's seat and faced the passengers. A second officer stationed himself at the rear of the bus, facing forward. The third officer began at the rear of the bus and worked his way forward, speaking with individual passengers as he went and asking about their travel plans and luggage. In each case, the officer stood next to or just behind the passenger with whom he spoke and did not block the aisle. *Id.* at 197-98. In questioning the defendants, the officer held up his badge long enough for them to identify him as a police officer, and spoke to them in a low voice, with his face some twelve to eighteen inches away from one of their faces. After receiving their consent, the police officer searched both defendants and found cocaine. *Id.* at 198-99.

The defendants moved to suppress the evidence of the cocaine. On appeal, the Supreme Court concluded that the defendants were not seized and their consent to the search was voluntary. *Id.* at 199-200. In explaining why there was no seizure in the case, the Supreme Court stated:

> Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means. If a reasonable

person would feel free to terminate the encounter, then he or she has not been seized.

. . . .

... [T]he police did not seize respondents when they boarded the bus and began questioning passengers. The officers gave the passengers no reason to believe that they were required to answer the officers' questions. When [the police officer] approached respondents, he did not brandish a weapon or make any intimidating movements. He left the aisle free so that respondents could exit. He spoke to passengers one by one and in a polite, quiet voice. Nothing he said would suggest to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter.

... There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice. It is beyond question that had this encounter occurred on the street, it would be constitutional. The fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure. Indeed, because many fellow passengers are present to witness officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police on a bus than in other circumstances.

*Id.* at 201-04 (citations omitted).

In *State v. Quezada,* the defendant moved to suppress evidence as the fruit of an illegal seizure. The superior court denied the motion after a hearing. On appeal and employing the tests of *State v. Riley* and, thus, *United States v. Mendenhall,* we concluded that the defendant was seized illegally under Part I, Article 19 of the State Constitution. *See State v. Quezada,* 141 N.H. 258.

In *Quezada,* two police officers were in a marked police cruiser at 1:15 a.m., looking for a suspect who had just committed a felony. They found the suspect in front of a boarding house, talking with the defendant. From a distance of approximately eight to ten feet, one officer called out to the two men, who then ended their conversation and separated. The officers alighted from the cruiser; the suspect walked toward the cruiser, and the defendant moved quickly up a set of steps to the front door of the boarding house. *Id.* at 258. One of the officers testified that he called to the defendant, "Hey, you, stop" and characterized his tone of voice as "calm

and relaxed," but loud enough so he would be heard. The defendant did not respond to the officer's call and fumbled with his keys as he attempted to unlock the front door. *Id.* at 258-59. The officer then walked to the bottom of the steps and said, "Hey, I want to speak to you." The defendant said, "Oh, me, okay," turned toward the officer and walked down the stairs. The defendant was subsequently arrested for possession of cocaine. *Id.* at 259.

In reviewing the circumstances of the case, we stated:

> [W]e are mindful that this analysis is an objective one, requiring a determination whether the defendant's freedom of movement was sufficiently curtailed by considering how a reasonable man in the suspect's position would have understood his situation.
>
> The record indicates that the defendant's situation was as follows. It was 1:15 a.m. No one else was on the street when two uniformed officers alighted from a marked police cruiser and called to the defendant and his companion. [One police officer] said to the defendant, "Hey, you, stop"—language indicating that compliance was not optional. Though the trial court observed that the defendant was apparently unaware that the officer was addressing him, the defendant apparently heard this request, for he responded to [the officer's] second hail by saying, "Oh, me, okay." The second hail—"Hey, I want to speak to you"—was made moments after the first, when the officer was a few feet behind the defendant; in conjunction with the first it fairly indicated that compliance was mandatory.
>
> . . . [W]e are persuaded that in view of all the circumstances in this case, the encounter transcended a mere request to communicate. Given the late hour, the absence of other citizens in the vicinity, the presence of two uniformed police officers, and the language of [the officer's] requests, no reasonable person would have believed he was free to ignore the officer and simply walk away.

*Id.* at 259-60 (quotations, citations, brackets, and emphasis omitted).

Not only do I believe that the circumstances of the instant case are readily distinguishable from those in *Quezada*, where I concurred that the defendant had been illegally seized under our State Constitution, but I also believe that they are far more benign than those in *Drayton*, where the Supreme Court found that there was no seizure under the Federal Constitution. Here, Officer Cook approached the defendant in a marked patrol boat, without flashing lights or siren, during a mid-afternoon of Labor Day weekend. There were some twenty to twenty-five watercraft in

the immediate area and the defendant's brother was in a second kayak immediately next to his. At a distance of approximately fifty feet from the defendant's kayak, and while his patrol boat was barely moving, Officer Cook held up a life jacket and asked if the defendant could show him his PFD.

There is no evidence that Officer Cook either coerced the defendant or constrained him from leaving. There is no evidence that Officer Cook refused to assist the defendant in righting his overturned kayak until he responded to the officer's question. I see no evidence of an application of force, intimidating movement, an overwhelming show of force, brandishing of weapons, blocking of exits, threat, command, or even an authoritative tone of voice. *See Drayton*, 536 U.S. at 204. For all of these reasons, I fail to see how Officer Cook's actions constituted a stop prior to the defendant's first indication that he did not have a PFD. Consequently I would affirm the trial court's decision.

After determining that Officer Cook's actions constituted a stop in violation of SOP 2010, the majority vacates and remands this case to the trial court for further proceedings. While I reiterate that I do not agree that Officer Cook's actions constituted a stop, I would give the trial court guidance concerning the proceedings on remand. Because the majority does not decide this issue on constitutional grounds, those proceedings will necessarily include a determination as to whether suppression is the proper remedy for a violation of the SOP, an issue not previously addressed by the parties at trial or on appeal. *Cf. State v. Canelo*, 139 N.H. 376, 385-88 (1995) (suppression of evidence appropriate remedy for illegal seizure under State Constitution).

I make one final observation. Officer Cook testified that there must be a PFD for every person aboard a kayak. He also testified that the PFD need not be worn (unless the kayaker is under six years old) or displayed. As such, unless the kayaker is wearing the required PFD, or somehow displaying it on the exterior of the kayak, there is no practical way of determining, absent asking the kayaker, if the required safety equipment is aboard the kayak. RSA 270-D:6 (1999) provides, in part:

> All vessels afloat on public waters may be inspected by the commissioner or his duly authorized representative, to determine their seaworthiness and safety equipment *at any time*.

(Emphasis added.) At oral argument, the defendant contended that marine patrol officers could never ask a kayaker to see a PFD, and thus carry out a portion of their boating safety mission, without violating a boater's constitutional rights. Given the laudable legislative mandate to ensure the safety of New Hampshire's boating public, I find it completely reasonable,

under the benign circumstances presented by this case, for the marine patrol officer to do his job, as mandated by RSA 270-D:6, by asking a kayaker if he has a PFD, without violating our Constitution.