Rockingham
No. 2008-755

## THE STATE OF NEW HAMPSHIRE

v.

## PATRICK W. JOYCE, III

Argued: September 23, 2009
Opinion Issued: December 4, 2009

*Kelly A. Ayotte*, attorney general (*Stephen D. Fuller*, senior assistant attorney general, on the brief and orally), for the State.

*Stephanie Hausman*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Patrick W. Joyce, III, was found guilty based upon stipulated facts of possession of a controlled drug with the intent to sell. *See* RSA 318-B:2 (2004) (amended 2008). He appeals an order of the Superior Court (*Nadeau*, J.) denying his motion to suppress evidence seized during an investigatory stop. We reverse and remand.

The following facts were adduced at the hearing on the motion to suppress. At approximately 8:18 p.m. on November 2, 2007, Officer Doyle

and Officer Archibald of the Londonderry Police Department received a report from dispatch that a woman was smoking marijuana outside a building located at 83 South Road in Londonderry. There are two apartment buildings located at that address. Officers Doyle and Archibald responded within four minutes of receiving the call, in separate cruisers. Londonderry Detective Adam Dyer arrived in his own vehicle just after the other officers.

All three officers parked on the street and walked around the side of one of the buildings to a parking lot. They saw only one occupied vehicle in the lot; it was running with its lights on, with a male driver, later identified as the defendant, and a female passenger, wearing a gray hooded sweatshirt, in the front seat. The vehicle was properly parked and was facing one of the apartment buildings in the complex. Archibald approached the driver's side of the vehicle and Doyle approached the passenger's side. The car windows were open, and both the defendant and the female passenger were smoking cigarettes. Dyer stayed at the rear of the vehicle.

Doyle spoke to the female passenger, explaining why they were there, and asked her for identification. The woman stated that she did not have her identification, but that her name was Thelma Sousa and that she lived at 83 South Road. Doyle asked Sousa to step out of the car. She complied. He told Sousa that they had received a call that she was smoking marijuana outside of the residence, and she denied that she had been doing so. Doyle asked why Sousa and the defendant were sitting in the car. Sousa stated that they had gone to the Quick Stop for cigarettes, and that the defendant was a friend who had driven her there. She appeared nervous, and again denied that they were smoking marijuana. Doyle testified that he did not observe Sousa doing anything that would indicate that she and the defendant were smoking marijuana, but that people who smoke marijuana often use cigarettes as masking agents.

While Officers Doyle and Archibald spoke to the defendant and Sousa, Detective Dyer learned from dispatch that the anonymous caller had stated that the woman smoking marijuana was named Thelma and wore a gray sweatshirt. Dyer asked Doyle to have Sousa come to the rear of the car. Dyer told Sousa that an anonymous caller had stated that she had been involved in drug activity. She denied that she had been. Dyer testified that Sousa appeared very nervous, and smelled of "fresh marijuana." Dyer asked her whether she had any drugs, what was going on, and why someone would report that she was smoking marijuana there. Sousa continued to deny "that there was anything going on."

Meanwhile, Officer Archibald took the defendant's identification and returned it to him. As Archibald finished speaking with the defendant, Doyle began speaking with him through the passenger's side window.

Doyle did not smell any marijuana. He explained why the officers were there, and that Sousa matched the description of the person smoking marijuana outside the building. He asked the defendant for his name and what he was doing in the parking lot. The defendant responded that he had given Sousa a ride to the store to pick up some cigarettes. At some point, Doyle asked the defendant whether he knew anything about a woman smoking marijuana and the defendant stated that he did not. Doyle asked whether there was anything in the car that he needed to know about, and the defendant replied "not that he could think of." He asked the defendant whether the police could "check[]" his car. The defendant refused, stating that it was his mother's car.

Dyer came to the passenger's side and began speaking with the defendant. Dyer then told Doyle to call Officer Perry to bring his "narcotics detection dog" to the scene because he smelled fresh marijuana while he was talking to Sousa outside the car and because Sousa had been in the defendant's vehicle. From the time that the officers arrived at 83 South Road until they called for the narcotics dog approximately ten to fifteen minutes had passed.

The defendant overheard the radio call for the dog. He then asked Dyer what was going to happen when Perry arrived. Dyer moved to the driver's side of the vehicle. He testified at the suppression hearing that "when [he] began talking to [the defendant] at the driver's side [he] could smell that same odor of marijuana [that he smelled on Sousa] coming out of [the] vehicle." Dyer told the defendant that, because he smelled marijuana on Sousa's person and smelled marijuana when he began talking to the defendant at the driver's side, Officer Perry would come with the drug-sniffing dog to "check" the car. The defendant asked what would happen next, and Dyer responded that if the dog "alerted on the car," the officers would impound his vehicle and seek a search warrant. The defendant asked what would happen after that, and Dyer stated that if they obtained a search warrant, they would search the car, and if they found drugs, the defendant could be charged.

The defendant told Dyer that he wanted to be "honest" and asked whether he could speak to him. Dyer responded that he could but did not have to. The defendant admitted that he had some marijuana on him. Dyer asked him to step out of the vehicle and to give him the marijuana. The defendant complied, and informed Doyle that there was more marijuana in the center console of the vehicle.

The defendant moved to suppress all evidence obtained as a result of the investigatory stop, arguing that the police lacked reasonable suspicion to seize him and thus violated his rights under Part I, Article 19 of the State Constitution and the Fourth and Fourteenth Amendments to the Federal

Constitution. He also argued that the police unlawfully expanded the scope of the stop and subjected him to custodial interrogation without warning him of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). Following a hearing, the trial court denied the motion, ruling that the officers had reasonable suspicion to detain the defendant when they approached the car, and that the police did not seize the defendant until they obtained his license and "held him at the car for further inquiry."

We first address the defendant's claims under the State Constitution, and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983). "In reviewing the trial court's rulings, we accept its factual findings unless they lack support in the record or are clearly erroneous." *State v. Steeves*, 158 N.H. 672, 675 (2009) (quotations omitted). We review the trial court's conclusions of law *de novo. Id.*

■ To determine whether the officers conducted a lawful investigative stop, "we conduct a two-step inquiry: first, we determine when the defendant was seized; second, we determine whether, at that time, the officer[s] possessed a reasonable suspicion that the defendant was, had been or was about to be engaged in criminal activity." *Id.*

■ "Not all interactions between the police and citizens involve a seizure of the person." *State v. Beauchesne*, 151 N.H. 803, 809 (2005). "So long as a reasonable person would feel free to leave, or terminate the encounter, the citizen is not seized under Part I, Article 19 of the State Constitution." *State v. Licks*, 154 N.H. 491, 493 (2006) (citations omitted). Accordingly, "[o]nly when the officer[s], by means of physical force or show of authority, ha[ve] in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Steeves*, 158 N.H. at 675. "Circumstances indicating a 'show of authority' might include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Beauchesne*, 151 N.H. at 810 (citation omitted).

■ We objectively determine whether the defendant was seized, and "ask whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he . . . was not free to leave." *Steeves*, 158 N.H. at 675; *see also Florida v. Bostick*, 501 U.S. 429, 437 (1991) (noting that crucial test is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business").

The defendant argues that he was seized "either upon the officer's first approach to the vehicle or shortly thereafter," or, alternatively, when Officer Archibald obtained his license. The State does not pinpoint when the seizure occurred, but argues that the police did not seize the defendant until after they had reasonable suspicion to do so — specifically, once Detective Dyer smelled the odor of fresh marijuana on Sousa. Like the State, the trial court did not pinpoint the exact moment that the defendant was seized, but found that he was not seized until the police took his license and held him at his car for further questioning.

■ We disagree with the defendant's argument. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions, or asks to examine the individual's identification." *State v. Daoud*, 158 N.H. 779, 782 (2009); *see also State v. Brown*, 155 N.H. 164, 168 (2007); *State v. Quezada*, 141 N.H. 258, 260 (1996). "Numerous courts recognize that when an officer approaches a person seated in a parked car and asks questions, this in and of itself does not constitute a seizure." *Licks*, 154 N.H. at 493.

■ We conclude that the officers seized the defendant, at the latest, when he overheard Officer Doyle call Officer Perry to come to the scene with the narcotics-sniffing dog. At that point, a reasonable person in the defendant's position would not have felt "free to leave." *See id.* When Doyle called Perry, the police had been on the scene for approximately ten to fifteen minutes. Three police officers, two in uniform, surrounded the defendant's car. Doyle had asked Sousa to step out of the car, and the police had repeatedly questioned Sousa and the defendant about whether they had been smoking marijuana. The persistence of the questioning indicated that the police would not terminate the encounter. The officers never told the defendant that he was free to leave. As the State conceded at oral argument, when the defendant heard the officers call for the narcotics-sniffing dog, he reasonably could have concluded that he would not be allowed to leave the scene until Perry and the dog arrived and completed their investigation.

■ This determination is consistent with our case law. In *Beauchesne*, we held that, under Part I, Article 19, the defendant was seized when the police officer identified himself as a police officer and ordered the defendant to stop. *Beauchesne*, 151 N.H. at 815. Similarly, in *Quezada*, we determined that the police seized the defendant when an officer yelled, "Hey, you, stop" and "Hey, I want to speak to you." *Quezada*, 141 N.H. at 260. Based upon all of the circumstances, including the late hour, lack of other people in the area, presence of two uniformed officers and the nature of the officer's

requests, we concluded that "no reasonable person would have believed he was free to ignore the officer and simply walk away." *Id.* Finally, in *State v. McKeown*, we found that the defendant was seized when the officer "came directly toward the defendant's kayak in a marked patrol boat," asked the defendant if he had a personal flotation device, and waited to determine whether he had such a device. *McKeown*, 151 N.H. 95, 97-98 (2004). We concluded that these factors "indicate[d] that the defendant's compliance with the officer's questioning was mandatory" so that "a reasonable person would not feel free to decline the officer's request or otherwise terminate the encounter." *Id.* (brackets and quotations omitted). Thus, we have held that, when the police order a person "to stop and answer questions . . . [s]uch commands, coupled . . . with a measure of investigative pursuit, [do] not . . . [leave] a reasonable person feeling free to disregard the police and simply walk away." *State v. Sullivan*, 157 N.H. 124, 130 (2008); *see Beauchesne*, 151 N.H. at 815; *McKeown*, 151 N.H. at 97-98; *Quezada*, 141 N.H. at 260. Accordingly, we conclude that the defendant was seized when he overheard Officer Doyle call for the narcotics-sniffing dog because a reasonable person in his position would not have felt "free to leave." *See Licks*, 154 N.H. at 493.

We next consider whether, at the moment of seizure, the officers had reasonable suspicion that the defendant was engaged in criminal activity. The defendant argues that the officers lacked reasonable suspicion because the anonymous tip was insufficient to support his detention and the police had no basis to suspect that he had committed a crime.

■ "For a police officer to undertake an investigatory stop, the officer must have reasonable suspicion, based upon specific, articulable facts taken together with rational inferences from those facts, that the particular person stopped has been, is, or is about to be, engaged in criminal activity." *State v. De La Cruz*, 158 N.H. 564, 569 (2009). "To determine the sufficiency of an officer's suspicion, we consider the articulable facts in light of all surrounding circumstances, keeping in mind that a trained officer may make inferences and draw conclusions from conduct that may seem unremarkable to an untrained observer." *State v. McKinnon-Andrews*, 151 N.H. 19, 26 (2004). "A reasonable suspicion must be more than a hunch," and "[t]he articulated facts must lead somewhere specific, not just to a general sense that this is probably a bad person who may have committed some kind of crime." *Id.* (quotations omitted). "The officer's suspicion must have a particularized and objective basis in order to warrant that intrusion into protected privacy rights." *Id.*

■ Because the defendant was seized when Officer Doyle called for Officer Perry and the narcotics-sniffing dog, any information that the police

acquired after the seizure cannot support a reasonable suspicion that the defendant was engaged in criminal activity. Therefore, even though Detective Dyer testified that he smelled marijuana on the defendant after he called for the narcotics-sniffing dog, this fact cannot justify the seizure of the defendant.

██ ██ Before the police seized the defendant, they had received an anonymous tip that a woman named Thelma wearing a gray sweatshirt was smoking marijuana outside 83 South Road, and Sousa matched that description. The anonymous tip contained no reference to the defendant or his car, and therefore could not have provided reasonable suspicion that the defendant was engaged in criminal activity. Moreover, the record does not support a reasonable suspicion that Sousa was linked to the defendant other than the fact that they were together in the car. At the scene, both Sousa and the defendant repeatedly told the officers that the defendant had driven Sousa to a local convenience store to buy cigarettes; when the officers arrived on the scene, both Sousa and the defendant were in the car smoking cigarettes. Although Sousa and the defendant seemed nervous, and Officer Doyle testified that the defendant gave deceptive responses to his questions, both the defendant and Sousa denied smoking marijuana, and nothing about the car provided information that would support detaining the defendant. *See State v. Darden*, 612 A.2d 339, 346 (Md. Ct. Spec. App. 1992) ("Nervousness is entirely consistent with innocent behavior . . . ." (quotations omitted)), *cert. denied*, 508 U.S. 957 (1993).

The State argues that the police could seize the defendant for further investigation because Sousa smelled of fresh marijuana and had been in the defendant's car. The defendant counters that this did not justify his seizure. We agree. Detective Dyer smelled the odor of fresh marijuana coming from Sousa only after she stepped outside of the defendant's vehicle. No officer smelled marijuana in the car, or the odor of burnt marijuana, before the defendant was seized. Therefore, while these facts may have supported a reasonable suspicion that Sousa was smoking or possessed marijuana, they do not support a reasonable suspicion that the defendant was engaged in criminal activity.

██ This result is consistent with our case law. In *Beauchesne*, we found that the police lacked reasonable suspicion to detain the defendant where the officer saw two men standing in an alley and saw one man hand something small and "unidentifiable" to the other man; it was not late at night and the area was not one where it was more likely that a drug transaction would occur. *Beauchesne*, 151 N.H. at 815. Similarly, in *State v. Boyle*, we determined that the police lacked reasonable suspicion where the defendant was parked on the side of the road and, in response to the

officer's query as to whether he had broken down, the defendant replied that he had "just dropped off a drunk female and was waiting to see if she was okay." *Boyle*, 148 N.H. 306, 306, 309 (2002) (considering application of community care-taking exception). We concluded that, although "[t]he officer may have had reason to believe that the drunk female needed aid . . . he had no reason to believe that the defendant, the sole occupant of the vehicle, needed it." *Id.* at 309. Finally, in *State v. Pepin*, we rejected the State's argument that the police had reasonable suspicion that the defendant was driving while intoxicated because he briefly squealed his tires on "club night" in Manchester. *Pepin*, 155 N.H. 364, 367 (2007). The defendant did not drive erratically or commit a traffic violation, and there was no evidence that he pulled out of a club parking lot or that there were clubs in the immediate area. *Id.* at 367-68. "[A] person's mere presence in a high-crime area, even at a late hour, is not a sufficient basis, standing alone, to justify a brief investigatory detention." *Id.* at 367 (quotation omitted); *see Brown v. Texas*, 443 U.S. 47, 52 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.").

Similarly, here, the police lacked reasonable suspicion that this particular defendant was engaging in criminal activity. *See Pepin*, 155 N.H. at 367 (noting that "it is the particular and not the general that counts" when determining reasonable suspicion). Because the defendant prevails under the State Constitution, we need not reach the federal issue. *See Ball*, 124 N.H. at 237.

Alternatively, the defendant argues that, even if the police had reasonable suspicion to detain him, the detention unlawfully exceeded the scope of the investigatory stop. Because we decide that the police lacked reasonable suspicion to detain the defendant when Officer Doyle called for the narcotics-sniffing dog, we need not address this argument.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, HICKS and CONBOY, JJ., concurred.