NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2018-0647



THE STATE OF NEW HAMPSHIRE

v.

MIGUEL FRANCISCO PEREZ

Argued: January 9, 2020
Opinion Issued: May 15, 2020


Gordon J. MacDonald, attorney general (Sean R. Locke, assistant attorney general, on the brief and orally), for the State.


Wadleigh, Starr & Peters, P.L.L.C., of Manchester, (Donna J. Brown on the brief and orally), for the defendant.


HANTZ MARCONI, J. Following a bench trial on stipulated facts, the defendant, Miguel Francisco Perez, was convicted on two counts of possession of a controlled drug with the intent to distribute, subsequent offense. See RSA 318-B:2 (2017), :26 (Supp. 2019). On appeal, he argues that the Superior Court (Wageling, J.) erred in denying his motion to suppress evidence seized pursuant to a search of his rental car following a motor vehicle stop. We affirm.

## I

The trial court found or the record supports the following facts.  On April 5, 2018, at approximately 10:40 p.m., Trooper Arteaga of the New Hampshire State Police Mobile Enforcement Team was monitoring northbound traffic on Interstate 95 when he observed a black Nissan Altima with a Colorado registration drive by him.  Following the car, Arteaga observed that the Altima was following approximately one car length behind a tractor trailer truck and that the driver twice failed to properly signal as he changed lanes to pass the truck.  The trooper proceeded to pull the car over after observing these traffic violations.  Arteaga testified that the Altima pulled over in a safe manner but that "[i]t came to a slow stop," which he described as one that, in his experience, took longer than usual for the driver to stop the car after acknowledging that he or she was being pulled over.

The trooper approached the passenger side of the vehicle and observed the defendant and a female passenger who was reclining in the front passenger seat.  Arteaga asked for the defendant's license and registration.  As the defendant handed over his license, his hand was visibly shaking.  The trooper also noticed that the tone of the defendant's voice was shaky and frantic when he explained that the Altima was a rental.  Arteaga asked the defendant for the rental agreement.  In response, the defendant asked the female passenger to retrieve the agreement from the glove compartment.  She did not initially react to this request and, instead, stared blankly ahead.  After about a minute, the defendant asked her again, at which point she retrieved the rental agreement from the glove compartment and gave it to Arteaga.

From the passenger side of the car, Arteaga began matching the information on the agreement to the defendant's license.  As the trooper was comparing this information, the defendant announced that he and his passenger were traveling to Portsmouth.  Arteaga testified that he found it suspicious that the defendant would volunteer this information unprompted.  While standing at the passenger side of the car, the trooper saw three cell phones in the Altima.  According to Arteaga, this was "significant" because he had learned, through his training and experience, that drug traffickers often use "burner" cell phones to conduct their drug-related activities.

At approximately the time the trooper noticed the three cell phones, he also noticed an odor of marijuana emanating from the vehicle.  Arteaga testified that he could not recall whether the odor smelled of fresh or burnt marijuana.

The trooper then returned to his cruiser where he queried the Altima's registration and confirmed it was a rental.  This information matched the rental agreement from the glove compartment.  Arteaga testified that "[r]ental vehicles are known to be used for drug transactions" because they tend to be mechanically reliable and if the registration is queried, the listed owner of the

vehicle is the rental company, not the actual driver of the vehicle. Arteaga also confirmed that the defendant's license, showing that he lived in Manchester, was valid. In addition, the trooper learned that the defendant was on parole for murder and that there were no active warrants for his arrest.

After these queries were completed, the trooper approached the Altima again, this time on the driver's side. He asked the defendant if he would exit the vehicle and speak with him at the rear of the car. The defendant agreed and stepped out. While speaking with him, Arteaga noticed that the defendant was nervous and visibly shaking. The trooper testified that "[d]ue to [the defendant's] nervousness and parole status," he asked if he could conduct a pat-frisk of the defendant for weapons. The defendant agreed, and Arteaga found no weapons or other contraband. Arteaga informed the defendant that he would be issuing him a warning for the traffic violations.

Arteaga then proceeded to make "small talk" with the defendant, asking questions about his parole status. The trooper also asked the defendant where he was coming from and where he was going to. The defendant responded that he was coming from Providence, Rhode Island, and was headed to Portsmouth. The trooper then asked the defendant about his female passenger, and the defendant explained that they were friends who had known each other for about a year. Arteaga "inquired further as to what they were doing in Portsmouth because it was close to 11 at night," and the defendant responded by telling the trooper that he could search the Altima. The trooper found this response suspicious because the trooper had not previously mentioned searching the vehicle. Arteaga testified that he believed the defendant was being "overly cooperative" and was trying to "call[ ] [his] bluff" by offering his consent to search and hoping the trooper would not accept the offer.

At this point, Arteaga told the defendant to stay at the rear of the vehicle while he spoke with the female passenger. The trooper asked her where they were coming from and she stated they were coming from Manchester. This response was inconsistent with the defendant's prior answer, which the trooper found suspicious. Arteaga also asked her how long she had known the defendant. She responded that they had known each other for only a few weeks. This answer was also inconsistent with the information provided by the defendant.

Arteaga returned to the rear of the car and asked the defendant if there were any drugs or anything illegal in the vehicle. The defendant said there were not. The trooper then asked the defendant if he could search the vehicle. The defendant replied that he had already told the trooper that he could search the car. Arteaga retrieved a written consent form and attempted to review it with the defendant; however, the defendant was anxious and immediately asked to sign the form. After the defendant signed the form, Arteaga searched the Altima and found two plastic bags containing drugs.

The defendant moved to suppress all evidence obtained as a result of the traffic stop. After an evidentiary hearing, the trial court found that Arteaga lawfully expanded the scope of the stop when he asked the defendant to step out of the vehicle because Arteaga had reasonable, articulable suspicion of drug activity when he made this request. Accordingly, the court denied the defendant's motion. The defendant was subsequently tried before a judge on stipulated facts and was found guilty. This appeal followed.

II

On appeal, the defendant argues that the trial court erred in denying his motion to suppress. He contends that Arteaga did not have reasonable, articulable suspicion to expand the scope of the initial stop and that his questioning impermissibly prolonged the detention and changed its fundamental nature. He argues that his subsequent consent to search the vehicle was "tainted" by this unconstitutional detention. See State v. Hight, 146 N.H. 746, 749 (2001). The defendant invokes the protections of Part I, Article 19 of the New Hampshire Constitution and the Fourth and Fourteenth Amendments to the United States Constitution. We first address the defendant's claims under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983). In reviewing a trial court's order on a motion to suppress, we accept its factual findings unless they lack support in the record or are clearly erroneous. State v. McInnis, 169 N.H. 565, 569 (2017). We review, de novo, the trial court's legal conclusions. Id.

The essential purpose of the Federal and State constitutional proscriptions against unreasonable searches and seizures "'is to impose a standard of "reasonableness" upon the exercise of discretion by government officials . . . to safeguard the privacy and security of individuals against arbitrary invasions.'" State v. McKinnon-Andrews, 151 N.H. 19, 22 (2004) (quoting Delaware v. Prouse, 440 U.S. 648, 653-54 (1979)). Part I, Article 19 of the New Hampshire Constitution protects "all people, their papers, their possessions and their homes from unreasonable searches and seizures." State v. Blesdell-Moore, 166 N.H. 183, 187 (2014) (quotation omitted); see N.H. CONST. pt. I, art. 19. Warrantless seizures are per se unreasonable under Part I, Article 19 unless the State proves by a preponderance of the evidence that the seizure falls within the narrow confines of a judicially crafted exception. State v. Folds, 172 N.H. 513, 517 (2019).

One such exception allows law enforcement to conduct traffic stops of motorists without a warrant. See McKinnon-Andrews, 151 N.H. at 22-23. A traffic stop is a seizure for purposes of the State Constitution. State v. Sage, 170 N.H. 605, 610 (2018). The scope of such an investigative stop must be carefully tailored to its underlying justification, must be temporary, and last no longer than is necessary to effectuate the purpose of the stop. Id. The scope of

4

a stop may be expanded to investigate other suspected illegal activity "only if the officer has a reasonable and articulable suspicion that other criminal activity is afoot." Id. (quotation omitted).  An investigatory stop may "'metamorphose into an overly prolonged or intrusive detention and, thus, become unlawful.'" Blesdell-Moore, 166 N.H. at 187 (parentheses omitted) (quoting State v. Michelson, 160 N.H. 270, 274 (2010)).  Whether the detention is a lawful investigatory stop, or goes beyond the limits of such a stop, depends upon the facts and circumstances of the particular case.  Id.

To determine whether an officer's inquiry unlawfully expanded the scope of an otherwise valid traffic stop, we undertake the following analysis:

> If the question is reasonably related to the purpose of the stop, no constitutional violation occurs.  If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question.  If the question is so justified, no constitutional violation occurs.  In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop.

McKinnon-Andrews, 151 N.H. at 25 (quotation and brackets omitted); see id. at 24-25; Blesdell-Moore, 166 N.H. at 187-88.

The defendant does not dispute that he was lawfully stopped for motor vehicle violations, and the State does not dispute that the scope of the initial stop was expanded.  The trial court found that Arteaga expanded the scope of the initial stop when he asked the defendant to step out of the car.  The defendant argues that Arteaga did not have reasonable, articulable suspicion of criminal activity to justify the stop's expansion and claims that Arteaga did not carefully tailor or diligently pursue his investigation into "drug trafficking."  The defendant contends that after the decriminalization of small quantities of marijuana in New Hampshire, see RSA 318-B:2-c, II (Supp. 2019), the odor of marijuana emanating from a vehicle cannot provide reasonable, articulable suspicion to expand a traffic stop without additional evidence.

The State counters that the totality of circumstances provided Arteaga with a reasonable, articulable suspicion "that the defendant was transporting drugs." [1]  It maintains that the defendant's argument with respect to the impact of decriminalization is not preserved.  In the alternative, the State argues that even after the decriminalization of marijuana, marijuana is still

---

[1] The State has not argued that the defendant had a reduced expectation of privacy due to his parole status.  Cf. State v. Zeta Chi Fraternity, 142 N.H. 16, 29-30 (1997).

considered contraband, and the odor of marijuana, alone, can provide reasonable suspicion that motorists have engaged in or are about to engage in other criminal conduct.

We begin with the State's preservation argument. We have often explained that the purpose of our preservation rule is to ensure that trial courts have an opportunity to rule on issues and to correct errors before parties seek appellate review. E.g., State v. Gross-Santos, 169 N.H. 593, 598 (2017). This requirement is intended to discourage parties who are unhappy with the trial result from combing the record to find an alleged error never raised before the trial judge that might support a motion to set aside the judge's ruling. Id. With these principles in mind, we have held that an issue is preserved when the trial court understood and therefore addressed the substance of an objection. Id.; see State v. King, 136 N.H. 674, 677 (1993).

Here, the defendant argued at the motion hearing that the odor of marijuana Arteaga detected was an "innocent observation[ ]" for which there could have been a "reasonable explanation[ ]" because the odor may have only denoted "a ticketable offense." The trial court described the defendant's argument as follows: "At the suppression hearing, Defendant argued that the odor of marijuana did not provide a reasonable articulable suspicion of criminal activity because possession of a small amount of marijuana is a civil offense. Therefore, Defendant argues, Trooper Arteaga had no legal basis to expand the scope of the stop." The analysis conducted by the trial court demonstrates that it understood and addressed the defendant's argument regarding the impact of decriminalization on the reasonableness of Arteaga's actions during the stop. The defendant presents this same challenge on appeal. Therefore, we conclude that the defendant's argument is preserved. See Gross-Santos, 169 N.H. at 598.

Turning to the merits of the defendant's arguments, we disagree that, post-decriminalization, the odor of marijuana is now a wholly innocent factor in determining whether reasonable, articulable suspicion of criminal activity exists. However, we also recognize that the odor of marijuana is not wholly synonymous with criminal activity. As relevant to the parties' arguments here, in 2017 the legislature amended the Controlled Drug Act by enacting RSA 318-B:2-c, making possession of three quarters of an ounce or less of marijuana a violation-level, rather than a criminal, offense in certain circumstances. See RSA 318-B:2-c, II, V (Supp. 2019); RSA 625:9, II(b) (2016) ("A violation does not constitute a crime . . . ."); see also RSA 126-X:2 (Supp. 2019) (legalizing medical marijuana). These changes in the law are significant given the standard for reasonable, articulable suspicion.

A temporary detention, or so-called "Terry stop," is lawful if the police have a reasonable, articulable suspicion that the person detained has committed or is about to commit a crime. McKinnon–Andrews, 151 N.H. at 22;

6

see Terry v. Ohio, 392 U.S. 1, 21 (1968). Reasonable, articulable suspicion refers to suspicion based upon "specific, articulable facts taken together with rational inferences from those facts — that the particular person stopped has been, is, or is about to be, engaged in criminal activity." McKinnon-Andrews, 151 N.H. at 25-26 (emphasis added and quotation omitted). To determine the sufficiency of an officer's suspicion, we consider the articulable facts in light of all surrounding circumstances, keeping in mind that a trained officer may make inferences and draw conclusions from conduct that may seem unremarkable to an untrained observer. Id. at 26. Although we recognize that experienced officers' perceptions are entitled to deference, this deference should not be blind. Sage, 170 N.H. at 610. A reasonable suspicion must be more than a hunch. McKinnon-Andrews, 151 N.H. at 26. The officer's suspicion must have a particularized and objective basis. State v. Joyce, 159 N.H. 440, 446 (2009). The articulable facts must lead to something specific and not simply a general sense that this is probably a bad person who may have committed some kind of crime. Sage, 170 N.H. at 610.

Prior to decriminalization, the odor of marijuana had been a relevant and noteworthy factor among those considered by this court when reviewing whether law enforcement had reasonable, articulable suspicion of criminal activity. See Blesdell-Moore, 166 N.H. at 189 (noting "the odor of burnt marijuana" is a "critical factor supporting reasonable suspicion"); State v. Livingston, 153 N.H. 399, 405 (2006) (holding the strong odor of burnt marijuana combined with defendant's nervousness and bloodshot eyes provided officer with reasonable suspicion during stop of motor vehicle); see also State v. Gilson, 116 N.H. 230, 233 (1976) ("An officer with sufficient experience to recognize the odor of burning marijuana has probable cause to suspect its presence when he detects the odor within the confines of an automobile.").

As the State correctly points out, only small quantities of marijuana have been decriminalized, and it remains a crime in New Hampshire to, for example, possess more than three quarters of an ounce of marijuana, RSA 318-B:26, II(c), operate a motor vehicle while impaired by marijuana, RSA 265-A:2 (2014), or, except as provided by RSA chapter 126-X, for individuals between the ages of eighteen and twenty-one to knowingly possess any marijuana-infused product, RSA 318-B:2-c, IV (Supp. 2019). Therefore, under New Hampshire law, the odor of marijuana may indicate both criminal and non-criminal activity.

"[W]hile a possible innocent explanation may impact the weight given to a particular fact in a [reasonable suspicion] determination, it does not wholly eliminate the fact's worth and require it to be disregarded." People v. Zuniga, 372 P.3d 1052, 1059 (Colo. 2016). Reasonable suspicion may be based upon activity that is consistent with both guilty and innocent behavior. McKinnon-Andrews, 151 N.H. at 26-27; see Zuniga, 372 P.3d at 1058-59; see also, e.g.,

7

State v. Turmel, 150 N.H. 377, 381 (2003); cf. Blesdell-Moore, 166 N.H. at 189 ("We think it impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." (emphasis added; quotation and brackets omitted)).

>        Furthermore,

>        "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that it can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."

State v. Melanson, 140 N.H. 199, 201 (1995) (brackets omitted) (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).

Therefore, although "the possession of a small amount of marijuana is now no longer criminal" in New Hampshire, the odor of marijuana "may serve as a basis for a reasonable suspicion that activities involving marijuana, that are indeed criminal, are underway," when considered among the totality of circumstances. Com. v. Cruz, 945 N.E.2d 899, 914-15 (Mass. 2011) (Cowin, J., dissenting) (emphasis added). Accordingly, we hold that the odor of marijuana remains a relevant factor that can be considered in determining whether reasonable, articulable suspicion of criminal activity exists.

At the same time, we conclude that the decriminalization of small quantities of marijuana in 2017, see Laws 2017, ch. 248; see also RSA 318-B:2-c, as well as the legalization of medical marijuana in 2013, see Laws 2013, ch. 242; see also RSA 126-X:2, are also relevant to determinations of whether the totality of the circumstances provides a reasonable, articulable suspicion of criminal activity. It is axiomatic that changing the definition of behavior that constitutes criminal activity will impact an analysis of circumstances that may give rise to reasonable, articulable suspicion of such activity. New Hampshire's decriminalization statute provides, in relevant part, that except as provided in RSA chapter 126-X, any person who knowingly possesses three quarters of an ounce or less of marijuana "shall be guilty of a violation." RSA 318-B:2-c, II. The statute further states that except as otherwise provided, "no person shall be subject to arrest for a violation of paragraph II . . . and shall be released provided the law enforcement officer does not have lawful grounds for arrest for a different offense." RSA 318-B:2-c, VI(a) (Supp. 2019).[2] Although "[i]t is true

_____

[2] Paragraph VI provides three exceptions to its provision that "no person shall be subject to arrest for a violation of paragraph II . . . and shall be released provided the law enforcement officer does not have lawful grounds for arrest for a different offense." RSA 318-B:2-c, VI; see id. Compare id., with Zullo v. State, 205 A.3d 466, 475 (Vt. 2019) (noting that Vermont's decriminalization statute

. . . that decriminalization has no effect on the distinctiveness of marijuana's odor," it "does affect the reasonableness of the officer's actions with respect to that odor." Cruz, 945 N.E.2d at 910 n.25.

As the statement of purpose for the decriminalization statute explains, decriminalization of small quantities of marijuana was intended to "result in less time and resources [being] spent on such cases, allowing police and courts to spend more time and resources dealing with serious crimes." Laws 2017, 248:1, I. The legislature also sought to reduce the "lifetime of harsh consequences" that accompany criminal penalties for possession of three quarters of an ounce or less of marijuana with an eye towards "address[ing] social and racial inequities in the New Hampshire criminal justice system." Laws 2017, 248:1, II, III.

Given this legislative landscape, we disagree with the State that the detected odor of marijuana alone supports, per se, a reasonable, articulable suspicion "that a person possesses an illegal quantity of marijuana." Particularly in light of these statutory changes, such a bright-line rule, as urged by the State, does not adequately "'safeguard the privacy and security of individuals against arbitrary invasions.'" McKinnon-Andrews, 151 N.H. at 22 (quoting Prouse, 440 U.S. at 653-54); see Livingston, 153 N.H. at 405; cf. Turmel, 150 N.H. at 381-82. Decriminalization, as well as the legalization of medical marijuana, provides "[a] possible innocent explanation or lawful alternative [that] may add a level of ambiguity to a fact's probative value" in analyzing the totality of circumstances supporting a reasonable, articulable suspicion of criminal activity. Zuniga, 372 P.3d at 1058. In addition, the case-by-case nature of the reasonable, articulable suspicion analysis counsels against a per se rule. See State v. Moore, 151 N.H. 288, 290 (2004) (concluding that the "case-specific, objective facts" supported a finding of reasonable, articulable suspicion); see also, e.g., Sage, 170 N.H. at 610; Livingston, 153 N.H. at 405.

We similarly reject the bright-line rule for which the defendant argues: that the trooper's observations cannot establish reasonable suspicion to justify the exit request because they were all, including the detected odor of marijuana, readily indicative of innocent behavior. See Moore, 151 N.H. at 290; see also, e.g., Blesdell-Moore, 166 N.H. at 189. Although any one factor in the totality of circumstances may seem innocent or innocuous in isolation, we consider the trooper's observations together and in light of the reasonable inferences that an officer who is experienced in detecting and investigating drug trafficking may draw. See United States v. Sokolow, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is

---

explicitly provided that decriminalization was "not intended to affect the search and seizure laws afforded to duly authorized law enforcement officers" (quotation omitted)). We note that neither party argues that any of these statutory exceptions are implicated by the facts of this case.

quite consistent with innocent travel.  But we think taken together they amount to reasonable suspicion.").

Here, the trial court found that the trooper detected the odor of marijuana emanating from the vehicle while standing at the passenger side of the car at approximately the same time he noticed the three cell phones.  Cf. Livingston, 153 N.H. at 405 (explaining that as the officer approached the defendant's vehicle, the officer "smelled a strong odor of burnt marijuana" emanating from it).  The trial court concluded that: (1) the odor of marijuana; (2) the tardiness of the stop; (3) "the nervous and odd behavior of the passengers"; (4) the extra cell phone; (5) the fact that the vehicle was rented; and (6) the defendant's criminal record, combined to create a reasonable, articulable suspicion of drug activity.  In doing so, the trial court afforded "considerable weight" to the trooper's observation of an odor of marijuana, because "the odor of marijuana emanating from a vehicle provides a police officer with reasonable articulable suspicion to detain and question an individual regarding the presence of marijuana."  See State v. Carrier, 172 N.H. ___, ___ (decided April 7, 2020) (slip op. at 15) (explaining that "the trial court's decision to accord . . . determinative weight" to one factor in its totality-of-the-circumstances analysis did not equate to the application of a per se rule).

If the trial court had applied a per se rule to the detected odor of marijuana, that would be error.  See McKinnon-Andrews, 151 N.H. at 25-26.  However, that is not the case here where, although the trooper's observations may seem innocuous in isolation, the totality of the circumstances identified by the trial court provided Arteaga with reasonable, articulable suspicion of criminal activity, which was sufficient to justify expanding the scope of the stop by asking the defendant to exit the Altima.  See State v. Sousa, 151 N.H. 297, 299 (2004) (recognizing that reasonable suspicion is a "less demanding standard than probable cause"); Melanson, 140 N.H. at 201; see also Sokolow, 490 U.S. at 7 (recognizing that the level of suspicion necessary for an investigative detention "is considerably less than proof of wrongdoing by a preponderance of the evidence").  Because we conclude that Arteaga had reasonable, articulable suspicion of criminal activity to ask the defendant to step out of the vehicle, and the defendant does not argue in the alternative that the scope of the stop was unlawfully expanded at a subsequent point in time, we conclude that no constitutional violation occurred.  See McKinnon-Andrews, 151 N.H. at 25; see also, e.g., Blesdell-Moore, 166 N.H. at 188 (defendant argued initial stop was unlawfully expanded when officer asked to see defendant's tongue to investigate whether defendant had possessed or consumed marijuana).

Our conclusion is not altered by the defendant's several arguments challenging Arteaga's diligence, or lack thereof, in specifically investigating the marijuana odor he testified that he observed.  To the extent these arguments challenge the credibility of the trooper's testimony regarding the observations

that led him to ask the defendant to step out of the Altima, we analyzed those observations above in the context of whether Arteaga had reasonable, articulable suspicion to expand the scope of the stop.  See McKinnon-Andrews, 151 N.H. at 25-26; Blesdell-Moore, 166 N.H. at 188-89.  In doing so, we were limited by our standard of review.  See McInnis, 169 N.H. at 569.  The trial court's decision to credit the trooper's factual testimony including, among other things, his testimony that an odor of marijuana emanated from the Altima, is not clearly erroneous.  We therefore will not substitute our own judgment of Arteaga's credibility for that of the trial court.  See Livingston, 153 N.H. at 402 ("We defer to the trial court's determinations of credibility unless no reasonable person could have come to the same conclusion after weighing the testimony.").

Specifically, the defendant contends that Arteaga was "on a fishing expedition to justify the expansion of the detention based on a hunch," and points out that Arteaga asked no questions about the odor of marijuana in the vehicle, "instead detain[ing] the defendant to question him about drug trafficking."  The defendant claims that, post-decriminalization, law enforcement must provide "specific information establishing their efforts to determine whether [an odor of marijuana] was related to criminal or non-criminal activity."  While this may be a prudent and worthwhile practice in light of the legislature's stated purpose for decriminalizing small quantities of marijuana, see Laws 2017, 248:1, I-III, we are not persuaded that it is constitutionally required.

In support of his arguments, the defendant relies upon our opinion in Livingston.  In Livingston, the officer made a lawful stop of the defendant's vehicle pursuant to the administrative search exception to the warrant requirement, stopping the defendant's truck to perform a routine commercial vehicle inspection.  See Livingston, 153 N.H. at 401, 403-04.  As the officer approached the defendant's vehicle, "he smelled a strong odor of burnt marijuana coming from inside it" and noticed that the defendant appeared to be nervous and had bloodshot eyes.  Id. at 401.  The officer "initially asked the defendant routine questions to determine whether the defendant's vehicle came within the scope of the federal motor carrier safety regulations."  Id.  "After determining that it did not, [the officer] told the defendant that he smelled burnt marijuana, and asked him whether he had any marijuana in the truck or on his person."  Id.  The defendant in Livingston argued that the officer "lacked authority to further question him" once the officer determined the defendant's vehicle did not qualify as a commercial motor vehicle.  Id. at 404.

We disagreed, holding that

[w]hile [the officer's] authority to detain the defendant under the administrative search exception ended when he looked at the vehicle registration and ascertained that the vehicle was not a commercial

vehicle, . . . [the officer] had reasonable suspicion to detain the defendant and question him regarding the presence of marijuana in his vehicle.

Id. at 405. In Livingston, the officer did remark that he detected an odor of marijuana and asked whether marijuana was present directly after confirming that the defendant's truck was not a commercial vehicle. See id. at 401. Our ultimate conclusion that the officer did not violate the constitution, however, did not rely upon the precise questions the officer asked or the precise point during the stop at which he asked them. See id. at 404-05. Contrary to the defendant's assertions here, Livingston does not mandate that law enforcement ask a particular set of questions at a particular point in time during the investigatory stop in order for its expansion to comport with the constitution. See id.; see also Sage, 170 N.H. at 610.

During a legal investigatory stop, an officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. Michelson, 160 N.H. at 274; accord Sage, 170 N.H. at 610. "As we have previously recognized, however, 'that observed activity could be consistent with both guilty and innocent behavior does not mean that an officer must rule out innocent explanations before proceeding.'" Sage, 170 N.H. at 610-11 (brackets omitted) (quoting State v. Galgay, 145 N.H. 100, 103 (2000)); accord Turmel, 150 N.H. at 381. While "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion), we cannot say that Arteaga acted unreasonably by asking the defendant to exit the vehicle before asking a direct question about the source of the odor of marijuana. See Moore, 151 N.H. at 290-91.

"The fact that there were other actions that a reasonable officer might have taken does not automatically render the actions that were taken unreasonable." Id. at 291; accord State v. Stacey, 171 N.H. 461, 467 (2018); see Sage, 170 N.H. at 608 (describing how officer, after detecting the odor of alcohol, first asked defendant if she had been drinking and then asked her if she would be willing to exit the vehicle to perform field sobriety tests). Nor does the trooper's investigative conduct during the stop compel us to conclude that no reasonable factfinder could have credited Arteaga's testimony. See Livingston, 153 N.H. at 402; see also McInnis, 169 N.H. at 569.

In sum, based upon the facts as found by the trial court, we hold that Arteaga's request for the defendant to exit the vehicle was supported by reasonable, articulable suspicion and did not unlawfully expand the scope of the stop. Because there was no constitutional violation which could have tainted the defendant's subsequent consent to search the Altima, see Hight, 146 N.H. at 749-50, the trial court did not err in denying the defendant's motion to suppress. The Federal Constitution offers the defendant no greater

12

protection than does the State Constitution under these circumstances.  <u>See</u> <u>McKinnon-Andrews</u>, 151 N.H. at 27; <u>Muehler v. Mena</u>, 544 U.S. 93, 100-02 (2005).  Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

<u>Affirmed</u>.

HICKS, BASSETT, and DONOVAN, JJ., concurred.