Merrimack
No. 2003-234

THE STATE OF NEW HAMPSHIRE

v.

JOSHUA MCKINNON-ANDREWS

Argued: January 14, 2004
Opinion Issued: April 30, 2004

*Peter W. Heed,* attorney general (*Peter K. Odom,* attorney, on the brief and orally), for the State.

*Landya McCafferty,* assistant appellate defender, of Dover, on the brief, and *Christopher McLaughlin,* assistant appellate defender, of Keene, orally, for the defendant.

NADEAU, J. Following a bench trial on stipulated facts, the defendant, Joshua McKinnon-Andrews, was convicted of possession of a narcotic. *See* RSA 318-B:2 (Supp. 2003). On appeal, he argues that the Superior Court (*Smukler,* J.) erroneously denied his motion to suppress evidence obtained during a search of his car following a motor vehicle stop. We affirm.

I

The trial court found or the record of the suppression hearing supports the following facts. Late in the afternoon on December 26, 2001, Officer Frank Harris of the New Hampshire Hospital Campus Police, while on duty in his cruiser, observed the defendant fail to stop at a posted stop sign. The officer followed the defendant and activated his blue emergency lights. The defendant stopped his car in a public parking lot, which is adjacent to an area behind the hospital restricted to authorized vehicles. The officer knew that it was "not uncommon for people who know [hospital] patients to try to get contraband to [them]" in this area.

After stopping his car, the defendant got out and approached the officer's cruiser. The officer exited his cruiser and told the defendant to get back into his car. The officer testified that he found it unusual for the defendant to approach him: "I've stopped a lot of cars in my career, and I

can say that I just don't recall many people doing that, if any, so that really raised some suspicions in me, and that was unusual, yes."

The officer then approached the defendant's car and asked him to produce his license and registration, which he did. The defendant had a New Hampshire license and a Rhode Island car registration. When asked, the defendant explained that he had borrowed the car. He further explained that he was on his way to the New Hampshire Department of Corrections to pay restitution.

The officer testified that the defendant appeared to have taken a roundabout route to the department. After failing to stop at the stop sign, the defendant headed towards the backside of the hospital, instead of "going straight where normal traffic goes." The officer explained that the defendant could have arrived at the department of corrections by either taking a left or going straight. Instead, he took a right and headed towards the restricted area.

The officer then asked the defendant "if he had anything in his vehicle that [the officer] should be aware of," to which the defendant replied, "What, like drugs? No, you want to check?" The officer replied that he would. The defendant immediately exited the car.

Before searching the defendant's car, the officer sought backup and ran a license check. Once his backup arrived, the officer searched the car, from which he retrieved the defendant's large red nylon bag. Upon opening the bag, the officer discovered a cigar box. Inside the cigar box was a digital scale and plastic measuring spoon covered in white powder that later tested positive for cocaine.

The trial court found that there were several articulable objective facts that justified the officer's investigative actions: (1) the defendant appeared to be driving into a restricted area where contraband could be passed to a hospital patient; (2) the defendant got out of his car and approached the officer's cruiser rather than waiting for the officer to approach him; and (3) the defendant's explanation that he was going to the department of corrections was inconsistent with the public parking lot's location.

The trial court ruled that these facts gave the officer reasonable suspicion to ask the defendant about the contents of the car. This question, the court determined, "was directed at precisely the facts giving rise to the suspicion—driving toward a restricted area where contraband could be passed, the possible attempt to divert attention from the vehicle and a destination explanation inconsistent with the defendant's route." Accordingly, the court ruled that the officer did not exceed the scope of the stop by asking the defendant about his car's contents.

On appeal, the defendant argues that the officer's question impermissibly expanded the scope of the stop and was unsupported by

reasonable articulable suspicion. He contends that the court's failure to suppress the evidence from the officer's search violated his federal and State constitutional rights to be free from unreasonable searches and seizures. *See* U.S. CONST. amends. IV, XIV; N.H. CONST. pt. I, art. 19.

We first address his claim under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), and cite federal authority for guidance only, *id.* at 233. In reviewing the trial court's ruling, we accept its factual findings unless they lack support in the record or are clearly erroneous. *State v. Wallace*, 146 N.H. 146, 148 (2001). Our review of the trial court's legal conclusions, however, is *de novo. Id.*

## II

It is helpful to begin by outlining the relevant constitutional framework. The essential purpose of the federal and State constitutional prescriptions against unreasonable searches and seizures "is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials . . . to safeguard the privacy and security of individuals against arbitrary invasions." *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979) (quotations omitted). We thus judge a particular law enforcement practice by balancing "the governmental interest that allegedly justified it against the extent of the intrusion on protected interests." *State v. Boyle*, 148 N.H. 306, 308 (2002); *see Prouse*, 440 U.S. at 654.

At a minimum, the reasonableness standard requires that "the facts upon which an intrusion is based be capable of measurement against an objective standard, whether this be probable cause or a less stringent test." *Prouse*, 440 U.S. at 654 (quotation omitted). Even where the balance of interests precludes insisting upon individualized suspicion, other safeguards are used to ensure that the individual's reasonable expectation of privacy is not subject to the discretion of the officer in the field. *Id.* at 654-55; *see State v. Goss*, 150 N.H. 46, 48-49 (2003) (adopting the reasonable expectation of privacy analysis under Part I, Article 19).

It is within this framework that we analyze the constitutionality of the officer's actions. In this case, the officer seized the defendant when he pulled the defendant's car over for a traffic violation. *See Prouse*, 440 U.S. at 653. A traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." *Id.*

"A temporary detention or a so-called '*Terry* stop,' is lawful . . . if the police have an articulable suspicion that the person detained has committed or is about to commit a crime." *State v. Wong*, 138 N.H. 56, 62-63 (1993) (quotations omitted); *see Terry v. Ohio*, 392 U.S. 1, 21 (1968).

"The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality); *see State v. Glaude*, 131 N.H. 218, 221 (1988) (acknowledging that an "important element" to consider when assessing the sufficiency of an officer's suspicion is the nature and quality of the intrusion on personal security as balanced against the important governmental interest allegedly justifying the intrusion).

To be constitutional, the scope of a *Terry* stop "must be carefully tailored to its underlying justification" and the stop "must be temporary and last no longer than is necessary" to effectuate its purpose. *Wong*, 138 N.H. at 63 (quotation omitted); *Royer*, 460 U.S. at 500. Although stops for traffic violations may be supported by probable cause, *cf. Whren v. United States*, 517 U.S. 806, 810 (1996), the *Terry* principles have consistently been applied to them. *See State v. McBreairty*, 142 N.H. 12 (1997) (stop for speeding); *see Pennsylvania v. Mimms*, 434 U.S. 106, 107-12 (1977) (per curiam) (stop for expired license plate).

The defendant concedes that the officer had reasonable articulable suspicion to stop him for the traffic violation. The issue posed by this appeal is whether the officer exceeded the scope of the initially valid *Terry* stop when he asked the defendant about the contents of his car. Put another way, the issue is whether the officer's question turned a reasonable seizure into an unreasonable one under the State and Federal Constitutions.

We have not yet articulated a cohesive theory as to the point at which an officer's question exceeds the scope of an initially valid *Terry* stop. *See State v. Parker*, 127 N.H. 525, 531 (1985) (officer "may take whatever additional action which would warrant a man of reasonable caution under the circumstances to take" (quotations omitted)); *State v. Maya*, 126 N.H. 590, 595-96 (1985) (questioning within scope because officer's suspicion not yet dispelled and stop lasted three minutes); *Glaude*, 131 N.H. at 222 (permissible to ask defendant for name and vehicle registration because this was "the routine and prudent first step in any investigative stop"); *cf. State v. Hight*, 146 N.H. 746, 748-49 (2001) (observing, in dicta, that "expansion of the scope of a motor vehicle stop to include investigation of other suspected illegal activity is constitutionally permissible only if the officer has a reasonable and articulable suspicion that other criminal activity is afoot" (quotation, ellipsis and brackets omitted)).

State and federal courts disagree about the contours of the Fourth Amendment limits on the duration and scope of a *Terry* stop. *See* Comment, *"Do You Have Any Drugs, Weapons, or Dead Bodies in Your Car?" What Questions Can a Police Officer Ask During a Traffic Stop?*,

76 TUL. L. REV. 211, 223-25 (2001-2002); Note, *The Scope of Police Questioning During a Routine Traffic Stop: Do Questions Outside the Scope of the Original Justification for the Stop Create Impermissible Seizures if They Do Not Prolong the Stop?*, 30 FORDHAM URB. L. J. 1919, 1944-46 (Sept. 2003). On one end of the spectrum are courts that permit police to question suspects during a traffic stop on any subject, as long as the questioning does not prolong the duration of the stop. *See United States v. Shabazz*, 993 F.2d 431, 436-37 (5th Cir. 1993); *United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (en banc). These courts reason that "because questions are neither searches nor seizures, police need not demonstrate justification for each inquiry. . . . [Q]uestions that do not increase the length of detention . . . do not make the custody itself unreasonable or require suppression of evidence found as a result of the answers." *Childs*, 277 F.3d at 949; *see Shabazz*, 993 F.2d at 436.

On the other end of the spectrum are courts that require the subject matter of police questioning to relate to the purpose of the stop, absent reasonable articulable suspicion of additional criminal activity. *See United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001); *United States v. Holt*, 264 F.3d 1215, 1230 (10th Cir. 2001) (en banc) (per curiam); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994). For these courts, police questioning that does not increase the length of detention can make the detention unreasonable. As the Tenth Circuit noted in *Holt*, 264 F.3d at 1229, "in the context of a nonconsensual police-citizen encounter, police questioning on matters unrelated to the purposes of the initial stop can be so intrusive as to violate the Fourth Amendment."

■ Ultimately, we believe that "neither approach strikes the proper balance between the government's interest in effective law enforcement and the individual's interest in being free from unreasonable governmental intrusions." *People v. Gonzalez*, 789 N.E.2d 260, 268 (Ill. 2003). Giving police unfettered discretion with respect to the questions they may pose to suspects in a *Terry* stop is overly permissive. *See id.* at 269. On the other hand, requiring *every* police inquiry either to be related to the initial purpose of the *Terry* stop or to be justified by reasonable articulable suspicion of additional criminal activity is unduly restrictive. *See id.* Because it strikes the right balance, we adopt the approach used by the Illinois Supreme Court in *Gonzalez*. *See United States v. Chhien*, 266 F.3d 1, 6, 9-10 (1st Cir. 2001) (rejecting "black and white" approach of Seventh Circuit in *Childs* and Tenth Circuit in *Holt* in favor of fact- specific inquiry as to whether officer's actions were "fairly responsive to the emerging tableau"), *cert. denied*, 534 U.S. 1150 (2002).

■ *Gonzalez* recognizes that the purpose of *Terry's* scope requirement is to "prevent[ ] law enforcement officials from fundamentally altering the nature of the stop by converting it into a general inquisition about past, present and future wrongdoing, absent an independent basis for reasonable suspicion or probable cause." *Id.* (quotation omitted). This approach also recognizes that the scope requirement was not intended to "prevent officers from engaging in facially innocuous dialog which a detained motorist would not reasonably perceive as altering the fundamental nature of the stop." *Id.* at 270 (quotation omitted).

To determine whether the *Terry* scope requirement has been exceeded, the Illinois Supreme Court examines whether: (1) the question is reasonably related to the initial justification for the stop; (2) the law enforcement officer had a reasonable articulable suspicion that would justify the question; and (3) in light of all the circumstances, the question impermissibly prolonged the detention or changed its fundamental nature. *Id.*

> If the question is reasonably related to the purpose of the stop, no [constitutional] violation occurs. If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question. If the question is so justified, no [constitutional] violation occurs. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop.

*Id.*; *see Chhien*, 266 F.3d at 9-10.

■ In this case, because the purpose of the initial traffic stop concerned the defendant's violation of a traffic law, we hold that the officer's question regarding the contents of the defendant's vehicle was not reasonably related to the stop's purpose. The officer initially stopped the defendant because he failed to heed a stop sign. The contents of the defendant's car are irrelevant to this purpose.

We believe, however, that the question was supported by reasonable articulable suspicion that the defendant had been, was, or was about to be, engaged in criminal activity. *See Hight*, 146 N.H. at 748. Reasonable articulable suspicion refers to suspicion based upon "specific, articulable facts taken together with rational inferences from those facts—that the particular person stopped has been, is, or is about to be, engaged in

criminal activity." *Id.* To determine the sufficiency of an officer's suspicion, we consider the articulable facts in light of all surrounding circumstances, keeping in mind that a trained officer may make inferences and draw conclusions from conduct that may seem unremarkable to an untrained observer. *State v. Pellicci*, 133 N.H. 523, 530 (1990). A reasonable suspicion must be more than a hunch. *See State v. Berrocales*, 141 N.H. 262, 265 (1996). The articulated facts "must lead somewhere specific, not just to a general sense that this is probably a bad person who may have committed some kind of crime." *State v. Vadnais*, 141 N.H. 68, 70 (1996). The officer's suspicion must have a particularized and objective basis in order to warrant that intrusion into protected privacy rights. *State v. Roach*, 141 N.H. 64, 66 (1996).

■ We agree with the trial court that several objective facts would have caused a reasonable officer to suspect that the defendant had been, was or was about to engage in criminal activity, sufficient to justify asking the defendant about his car's contents. Chief among these was that the defendant approached the officer first, instead of waiting for the officer to approach him. A reasonable officer rationally could have inferred that the defendant approached the officer first because he was concerned about the officer viewing the car's contents.

A reasonable officer could also have entertained a reasonable suspicion that the defendant's car contained contraband because he was driving into a restricted area where contraband was sometimes passed to hospital patients and because his explanation for where he was going was inconsistent with the direction in which he was heading. A reasonable officer could have inferred from this inconsistency as well as from the parking lot's proximity to the restricted area in which contraband had been given to patients that the defendant was driving towards the restricted area to pass contraband to patients. We hold that these objective facts were sufficient to create a reasonable and articulable suspicion that the defendant had been, was, or was about to be engaged in criminal activity. As such, these facts justified the officer's question about the car's contents.

"Although some of these [facts] may appear innocent in isolation, when taken together and considered in light of the reasonable inferences that officers who are experienced in investigating drug transactions may draw," *Pellicci*, 133 N.H. at 530, they constituted reasonable grounds to suspect that the defendant had contraband in his car and warranted asking about the car's contents. Contrary to the defendant's assertions, reasonable suspicion may be based upon activity that is consistent with

both guilty and innocent behavior. *State v. Turmel,* 150 N.H, 377, 381 (2003); *United States v. Woodrum,* 202 F.3d 1, 7 (1st Cir. 2000).

Because we determine that the officer had reasonable articulable suspicion to justify asking about the car's contents, we find no violation of the State Constitution. Because the Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances, *see Turmel,* 150 N.H. at 382; *Terry,* 392 U.S. at 16-30, we reach the same result under the Federal Constitution as we do under the State Constitution.

*Affirmed.*

DALIANIS and DUGGAN, JJ., concurred; BRODERICK, J., concurred specially.

BRODERICK, J., concurring specially. I, too, prefer the approach used by the Illinois Supreme Court in *People v. Gonzalez,* 789 N.E.2d 260 (Ill. 2003), to analyze the limits of a *Terry* stop and would adopt it. *See Terry v. Ohio,* 392 U.S. 1 (1968). While I agree with the majority that the officer's question in this case was not reasonably related to the purpose of the initial stop, I disagree that the question was supported by reasonable articulable suspicion. Unlike the majority, therefore, I would reach the third prong of the *Gonzalez* test and would analyze whether the question impermissibly prolonged the detention or altered its fundamental nature. *Gonzalez,* 789 N.E.2d at 270. I would hold that although the question did not prolong the detention, it did alter its fundamental nature. I nonetheless concur in the result because I believe that, despite the unlawful detention, the defendant's consent was valid.

I believe that there was no reasonable articulable suspicion that the defendant had contraband in his car. Reasonable suspicion "must be . . . something more than an inchoate and unparticularized suspicion or 'hunch' linking an individual to criminal activity." *United States v. Woodrum,* 202 F.3d 1, 6-7 (1st Cir. 2000) (quotation omitted); *see State v. Berrocales,* 141 N.H. 262, 265 (1996). "This means that some of the facts on which the officer relies must be particular, that is, specific to the individual." *Woodrum,* 202 F.3d at 7.

In this case, I believe that the facts upon which the officer relied were insufficiently specific to the defendant. The officer testified that he *commonly* asks individuals whom he stops for traffic violations if they have anything in their car of which he should be aware. He further testified that there was nothing about the defendant's appearance or behavior that made him suspicious. As the officer testified, "He was actually fairly polite;

obviously, voluntarily, worked with me, except just by him exiting that vehicle twice."

The officer also testified that the area in which the defendant parked, while near a restricted area where contraband could be passed to hospital patients, was not, itself, a restricted area. It was a public parking lot. Moreover, the officer acknowledged that the defendant could have driven into the lot because the officer was trying to stop him and it seemed the safest place to stop the car. While the public parking lot's location might have been sufficient to put the officer on guard, I do not believe it was sufficient to justify the officer's question about the car's contents. *See id.* The defendant's presence in the public parking lot "is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry." *Illinois v. Wardlow*, 528 U.S. 119, 139 (2000) (Stevens, J., concurring in part and dissenting in part). Were the law otherwise, *any* person who stopped in that parking lot, after having been followed by the police for a traffic violation, could be asked about the contents of his or her car. *See Woodrum*, 202 F.3d at 7.

The defendant-specific facts to which the officer testified were, in my mind, insufficient to support the adverse inference that the defendant's car contained contraband. There is nothing inherently suspicious either about exiting one's vehicle to greet an officer or being lost. The facts upon which the officer relied, taken together, would not have led a reasonable officer to suspect that the defendant had contraband in his car. While the perceptions of experienced officers are indeed entitled to deference, this deference should not be blind. *Id.*

In the absence of a reasonable connection to the stop's purpose or reasonable articulable suspicion, I would reach the third prong of the *Gonzalez* test: whether the officer's question impermissibly prolonged the detention or changed its fundamental nature. *See Gonzalez*, 789 N.E.2d at 270. Because the officer's question occurred before he issued the defendant a ticket, the question did not prolong the detention. The stop had not yet been concluded; its purpose had not yet been achieved. *See State v. Szczerbiak*, 148 N.H. 352, 355 (2002) (purpose of stop fulfilled once officer examined defendant's identification, dispelling his suspicion that defendant was an underage drinker).

I believe, however, that the question altered the fundamental nature of the stop. It converted the stop from a routine traffic stop into a general investigation of the defendant's past, present and future wrongdoing. *See People v. Harris*, 802 N.E.2d 219, 228 (Ill. 2003). The officer's question was not "facially innocuous." *Gonzalez*, 789 N.E.2d at 270; *see United States v. Chhien*, 266 F.3d 1, 9 (1st Cir. 2001) (officer permissibly may pose "a few prosaic questions" about suspect's itinerary), *cert. denied*, 534 U.S. 1150

(2002). To my mind, a reasonable motorist would have perceived the question as altering the fundamental nature of the stop. *Gonzalez*, 789 N.E.2d at 270; *see Chhien*, 266 F.3d at 7-9.

A conclusion that the detention of the defendant became unlawful once the officer asked about the car's contents does not lead inexorably to the conclusion that the defendant's consent to search the car was invalid. *See Szczerbiak*, 148 N.H. at 356; *see also State v. Hight*, 146 N.H. 746, 749 (2001); *Chhien*, 266 F.3d at 7-8. When determining whether the State has purged the taint of an unlawful detention followed by a consent to search, we consider: (1) the temporal proximity between the unlawful detention and the consent to search; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Szczerbiak*, 148 N.H. at 356; *see Hight*, 146 N.H. at 750.

In this case, as in both *Szczerbiak* and *Hight*, there was complete temporal proximity between the unlawful detention and the defendant's consent; the defendant consented while unlawfully detained. *See Szczerbiak*, 148 N.H. at 356; *Hight*, 146 N.H. at 750. Also, as in both those cases, there were no intervening circumstances that would have purged the taint of the unlawful detention, such as the officer informing the defendant of his right to refuse to answer his question. *See Szczerbiak*, 148 N.H. at 356; *Hight*, 146 N.H. at 750.

In this case, unlike both *Szczerbiak* and *Hight*, the officer did not ask for the defendant's consent. The defendant volunteered it. As we explained in *Szczerbiak*, one of the reasons we require the government to prove that the taint of an illegal seizure has been purged is to deter police misconduct. *Szczerbiak*, 148 N.H. at 357. Where the officer did not seek consent, I believe that it would not further the deterrence purpose to hold that the defendant's volunteered consent was "tainted." Accordingly, I would conclude that the unlawful detention did not vitiate the defendant's consent and, on this ground, affirm the trial court's denial of his motion to suppress.