NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2015-0377

THE STATE OF NEW HAMPSHIRE

v.

JESSICA MORRILL

Argued: October 19, 2016
Opinion Issued: March 10, 2017

Joseph A. Foster, attorney general (Danielle E. Horgan, assistant attorney general, on the brief and orally), for the State.

Stephanie Hausman, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

LYNN, J. The defendant, Jessica Morrill, appeals her conviction, following a jury trial in Superior Court (Delker, J.), on three counts of possession of a controlled drug (oxycodone, alprazolam, and lisdexamfetamine), and one count of possession of a controlled drug with intent to sell or distribute (cocaine). See RSA 318-B:2, I (2011). On appeal, she argues that the trial court erred by denying her motion to suppress evidence seized during a stop for a motor vehicle violation, and by denying her motion to dismiss the possession with intent to sell or distribute charge at the close of the State's case at trial. We reverse and remand.

I.  Background

      We accept the trial court's findings where supported by the record of the suppression hearing.  See State v. Roy, 167 N.H. 276, 282 (2015).  For the purpose of determining the sufficiency of the evidence, we also consider facts adduced at trial.  See State v. Rodney Portigue, 125 N.H. 352, 355 (1984).  The following facts are relevant to our analysis.  Shortly before midnight on December 31, 2013, State Trooper McAulay observed a van traveling north on Interstate Route 95.  After a computer license plate check indicated that the van's license plate was registered to a different vehicle, McAulay activated his emergency blue lights.  The van travelled "an unusually long distance"— approximately one-eighth of a mile—before stopping.  The trial court noted that, according to McAulay's testimony, based upon his training and experience, such a delay "can be indicative of an occupant in the car trying to hide something."

      When he approached the passenger side of the vehicle, McAulay observed an adult male in the driver seat and an adult female in the front passenger seat.  He also observed three young children in the back of the van: one restrained in a car seat, one wearing a seatbelt, and the third lying down on a bench seat and covered with blankets.  According to McAulay, the children were underdressed for the cold weather, and it appeared as though they had been "thrown in the back" of the van.

      McAulay illuminated the cabin with a flashlight and requested the driver's license and the vehicle's registration paperwork.  The driver, Jason Millett, produced a valid driver's license and the van's registration.  The registration paperwork indicated that the van was recently registered to the adult female passenger, later identified as the defendant.

      McAulay asked Millett from where they had been traveling.  Millett replied that they had been visiting the defendant's friend in Massachusetts, but could not recall the name of the town.  Millett stated that the town's name began with the letter W, and tried to pronounce the town's name in an "almost stuttering" fashion.  The defendant did not interject, but, rather, kept looking forward.  Although Millett looked at McAulay when handing over his license and the registration, he looked forward the remainder of the time.  Millett appeared to be unusually nervous; he was "jittery" and "shaking uncontrollably."  After reviewing the documentation Millett provided, McAulay asked why the children were not properly restrained.  McAulay could not remember precisely how the defendant and Millett responded, but he testified that they could not explain why the children were not properly restrained.

      McAulay then returned to his cruiser, where he spoke with Sergeant Cooper who had arrived on scene.  McAulay, according to his testimony, "felt there was a lot more to the story than [Millett and the defendant] were putting

2

on." He testified that he suspected the defendant and Millett had been, were, or were about to become engaged in criminal activity, but that he "didn't know at that point" what that might be.

When he returned to the van, McAulay asked Millett to step outside and speak with him. Millett complied.

Outside the van, Millett repeatedly placed his hands in his pockets, despite McAulay's request that he refrain from doing so. McAulay asked Millett whether he was carrying any weapons, and Millett replied in the negative. A pat frisk confirmed that Millett had responded truthfully. However, Millett continued to appear "very nervous" and paced back and forth. He also paused and looked away from McAulay before answering questions. McAulay questioned Millett about where they had been. Millett again stated that they had come from a town in Massachusetts, and that the town's name began with the letter W. McAulay asked whether he meant Worcester, and Millett replied that Worcester "sounded right." In response to McAulay's questioning regarding the family's travel itinerary, Millett stated that the family had left Maine at approximately 2:00 p.m. that day and had visited the defendant's friend. At that time, McAulay asked if there were "any drugs or any illegal items" in the van. Millett replied that there were not.

In the meantime, Cooper spoke with the defendant. The defendant reported a different itinerary to Cooper than Millett had provided to McAulay. Cooper then informed McAulay of the defendant's version, and McAulay questioned Millett about inconsistencies between Millett's and the defendant's stories. Unable to explain the inconsistencies, Millett became increasingly nervous and adopted a "fight or flight" stance.

McAulay then requested Millett's consent to search the van. Millett refused. McAulay thereafter informed Millett of his right to refuse consent. He also requested a canine unit to perform a sniff of the vehicle, and told Millett that he planned to apply for a search warrant if the dog signaled that the vehicle contained contraband. At this point, Millett verbally consented to the search, and subsequently executed a "consent to search" form. A search of the van revealed, among other things, oxycodone, alprazolam, lisdexamfetamine, and cocaine. Millett and the defendant were arrested.

Prior to their respective trials, both Millett and the defendant moved to suppress the evidence obtained from McAulay's search of the van. The trial court consolidated the two cases for a suppression hearing, and, after the hearing, denied Millett's and the defendant's motions.

At trial, the State presented the testimony of Cooper, McAulay, and a controlled substances identification expert from the State crime lab. Cooper testified that, during the motor vehicle stop, the defendant told him that Millett

3

was her boyfriend, that they had been together for approximately fourteen years, and that she and Millett were the parents of the three children in the rear of the van. He also testified that the defendant told him that the family had been in Connecticut visiting her aunt, and had stopped to see her friend in Massachusetts. Cooper described the defendant's demeanor during the stop as "pretty relaxed," explaining that she "seem[ed] to look like she was . . . tired" and that her "speech was kind of slowed."

McAulay testified to both the circumstances of the motor vehicle stop and to his search of the van. McAulay explained that he recovered three prescription bottles containing pills from a purse located on the floor of the passenger compartment of the vehicle. He also explained that he found an unlocked, magnetized black box located between the driver and passenger seats, directly in front of the first row of bench seats in the rear of the van, and underneath a jacket or blanket. According to McAulay, the black box held several pieces of gum, a Trident gum wrapper, $1,930 in cash, and two plastic sandwich bags containing a solid, hard-pressed white substance. McAulay testified that a person seated in either the driver seat or the passenger seat could have accessed the black box. He also testified that, based upon his training and experience, the magnetized black box was of the type typically used as a "hide," which he explained "can basically be stored underneath a vehicle . . . anywhere that isn't inside the vehicle." McAulay also testified that Millett was searched incident to his arrest, that this search revealed a piece of Trident gum in the pocket of Millett's sweatshirt, and that a subsequent warrant search of the van revealed a portion of a prescription pill near the driver's seat, two cellular telephones, and $121 in cash in the center console of the vehicle.

Also at trial, the controlled substances identification expert testified that she tested one of each kind of the pills recovered from the purse, and found the pills to contain oxycodone, alprazolam, and lisdexamfetamine, respectively. She also testified that she tested the white substance contained in the black box and found it to be approximately 2.88 ounces of cocaine. According to McAulay, this amount of cocaine was "much more than what [is] typically see[n] for . . . someone that uses cocaine for their own habit."

After the State rested, the defendant moved to dismiss the indictment alleging possession with intent to sell or distribute cocaine, arguing that the trial record was devoid of evidence that she directly or constructively possessed the cocaine. The trial court denied the defendant's motion to dismiss, reasoning that the evidence presented "would allow a jury to reasonably conclude that [she] had constructive possession of the box with the cocaine in it." The trial court specifically identified this evidence as including: the defendant's lack of responsiveness during the stop, the box's accessibility from the passenger seat, and the proximity of the box to the defendant's children.

4

The jury thereafter convicted the defendant on all charges. This appeal followed.

II.  Motion to Suppress

The defendant[*] first contends that the trial court's failure to suppress the evidence seized from the van violated her state and federal constitutional rights to be free from unreasonable searches and seizures. See N.H. CONST. pt. I, art. 19; U.S. CONST. amends. IV, XIV.

We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983). When reviewing a trial court's order on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous, and we review legal conclusions de novo. State v. Blesdell-Moore, 166 N.H. 183, 187 (2014).

"Part I, Article 19 of the New Hampshire Constitution protects all people, their papers, their possessions and their homes from unreasonable searches and seizures." Id. (quotation omitted). Evidence obtained in violation of a defendant's rights under Part I, Article 19 of the State Constitution is inadmissible under the exclusionary rule, though an exception to this rule may apply if the State proves that the taint of the primary illegality is purged. Id.

"A traffic stop is a 'seizure' . . . even though the purpose of the stop is limited and the resulting detention quite brief." State v. McKinnon-Andrews, 151 N.H. 19, 22 (2004) (quotation omitted). Such a stop is lawful when "the police have an articulable suspicion that the person detained has committed or is about to commit a crime." Id. (quotation omitted). "The scope of such an investigative stop must be carefully tailored to its underlying justification, must be temporary, and [must] last no longer than is necessary to effectuate the purpose of the stop." Blesdell-Moore, 166 N.H. at 187 (quotation and brackets omitted). "The scope of a stop may be expanded to investigate other suspected illegal activity only if the officer has a reasonable and articulable suspicion that other criminal activity is afoot." Id. (quotation omitted). "An investigatory stop may metamorphose into an overly prolonged or intrusive detention (and, thus, become unlawful)." Id. (quotation omitted). "Whether the detention is a lawful investigatory stop, or goes beyond the limits of such a stop, depends upon the facts and circumstances of the particular case." Id.

We have adopted a three-pronged test to determine whether the scope of an otherwise valid stop has been exceeded based on further questioning:

---

[*] Millett's and the defendant's cases are not consolidated on appeal.

5

If the question is reasonably related to the purpose of the stop, no constitutional violation occurs. If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question. If the question is so justified, no constitutional violation occurs. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop.

McKinnon-Andrews, 151 N.H. at 25 (quotation and brackets omitted). The State bears the burden of establishing under this test that the scope of an otherwise valid stop was not exceeded. Cf. State v. Parker, 127 N.H. 525, 529 (1985) ("The State has the burden of justifying the stop of the defendant's vehicle as a legitimate investigative stop.").

Here, the trial court identified McAulay's request that Millett step out of the vehicle as the relevant point of expansion of the stop. The trial court found that "the expansion was valid under the second prong of the McKinnon-Andrews test," reasoning that, by this time, McAulay had a reasonable, articulable suspicion that the defendant and Millett were engaged in "any number of . . . crimes, including kidnapping" and "drug smuggling." It concluded that, therefore, McAulay was justified in questioning Millett outside the van and later calling for a canine unit.

On appeal, the defendant does not dispute that McAulay had a reasonable, articulable suspicion for the initial stop of her vehicle. Instead, she argues that the trial court erred in finding that the requirements of McKinnon-Andrews for permissibly expanding the initial scope of the stop had been met. We agree.

In their briefs and at oral argument, the parties devoted considerable effort to debating the issues of whether, to be justified in expanding the scope of a traffic stop, a police officer must have an articulable suspicion about a particular type of criminal activity, or merely criminal activity generally. They also argued about whether McAulay possessed a proper basis for the expansion at various points during the interaction with the defendant and Millett before McAulay called for the canine unit. We find it unnecessary to address these arguments. Regardless of whether McAulay was justified in pursuing some further inquiries of the defendant and Millett, by the time McAulay called for the canine unit, he had already satisfactorily resolved the license plate issue that provided the initial justification for the stop, and none of his further inquiries established a reasonable suspicion that the vehicle contained illegal drugs. Thus, McAulay's implied ultimatum to Millett to either permit a search

6

of the vehicle or wait some unspecified length of time for the canine unit to arrive prolonged the stop without a proper basis for doing so.  See Rodriguez v. United States, 135 S. Ct. 1609, 1616 (2015).

We note that, at the suppression hearing, McAulay testified that the absence of a proper child safety seat for one of the children in the vehicle could not be resolved "immediately on the roadside."  To the extent that this testimony could be interpreted to suggest a valid alternative reason for prolonging the stop, the State does not, on appeal, seek to justify the prolongation of the stop on this basis.

Accordingly, we hold that the continued detention of the defendant after the call for a canine unit was unlawful.

Because the continued detention was unlawful, we next consider whether the illegality of that detention tainted Millett's consent to search the van.  "The fruit of the poisonous tree doctrine requires the exclusion from trial of evidence derivatively obtained through a violation of Part I, Article 19 of the New Hampshire Constitution."  State v. Cobb, 143 N.H. 638, 650 (1999) (quotation omitted).  We have implicitly adopted the federal rule that, when consent is the product of an unlawful detention during a motor vehicle stop, such consent is "tainted" by the illegality of the detention.  State v. Hight, 146 N.H. 746, 749 (2001).  However, we have not adopted a per se rule requiring suppression.  Id.  "Rather, . . . the question to be resolved is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Cobb, 143 N.H. at 650 (quotation omitted).  The State bears the burden to "demonstrate that any taint of an illegal search or seizure has been purged or attenuated."  Hight, 146 N.H. at 749 (quotation omitted).

The State does not argue that the taint of the unlawful detention has been purged or attenuated in the instant case.  Accordingly, the State failed to meet its burden to establish that the evidence obtained as a result of the consent search of the van should not be suppressed.  See id.  The trial court erred in denying the defendant's motion to suppress.  Because the defendant prevails under the State Constitution, we need not reach her federal claim.  See Ball, 124 N.H. at 237.

### III.  Sufficiency of the Evidence

The defendant next argues that the evidence was insufficient to convict her of possession of cocaine with intent to sell or distribute.  Although we conclude that the evidence obtained from the search of the van should have been suppressed at trial, we must address the defendant's sufficiency of the evidence arguments "because if the evidence was insufficient to support the

7

conviction, the Double Jeopardy Clauses of both the New Hampshire and United States Constitutions would preclude a new trial." State v. Gordon, 161 N.H. 410, 418 (2011) (quotation omitted). However, in determining whether the evidence was sufficient, we consider all the evidence—including evidence that was erroneously admitted. Id. Thus, although the evidence seized during the search of the van should not have been admitted at trial, we consider this evidence in assessing the defendant's challenge to the sufficiency of the evidence.

"A challenge to the sufficiency of the evidence raises a claim of legal error; therefore, our standard of review is de novo." State v. Collyns, 166 N.H. 514, 517 (2014). "To prevail upon her challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt." Id. (quotation and brackets omitted). When the evidence is solely circumstantial, it must exclude all reasonable conclusions except guilt. State v. Germain, 165 N.H. 350, 360 (2013). "Under this standard, however, we still consider the evidence in the light most favorable to the State and examine each evidentiary item in context, not in isolation." State v. Dodds, 159 N.H. 239, 246 (quotation omitted).

The defendant argues that the evidence was insufficient to establish that she: (1) knowingly possessed the cocaine; and (2) intended to distribute it. We first address the defendant's challenges relating to possession and then turn to her challenges relating to intent to sell or distribute.

To convict the defendant of possession of a controlled substance, the State needed to prove beyond a reasonable doubt that the defendant: "(1) had knowledge of the nature of the drug; (2) had knowledge of its presence in [her] vicinity; and (3) had custody of the drug and exercised dominion and control over it." State v. Turmelle, 132 N.H. 148, 155 (1989) (quotation omitted). "When, as here, the defendant was not in physical possession of the drugs, the State must prove constructive possession." State v. Francis, 167 N.H. 598, 604 (2015). "This can be inferred from circumstances linking the defendant to the controlled substance, such as the presence of the defendant's personal possessions near the drugs." Id. at 604-05. "Constructive possession of drugs need not be exclusive." Id. at 605. "As we have recognized, when more than one person occupies the premises where drugs are found, mere proof that a defendant is one of those occupants is insufficient to prove his constructive possession." Id. (quotation and brackets omitted). "However, evidence that the defendant's personal possessions were in close proximity to the controlled substance may provide a sufficiently close nexus between the defendant and the substance to allow the jury to infer possession." Id. (quotation omitted).

The defendant first argues that "there was insufficient evidence that [she] knew the cocaine was in her presence or that she constructively possessed it." She contends that the evidence "connect[ing] her to the cocaine" was solely circumstantial, and that the evidence was insufficient because it did not exclude all reasonable conclusions except guilt. See Germain, 165 N.H. at 360. She claims that it would have been "reasonable to infer that [she] did not know that [the cocaine] was there," and appears to contend that her presence in the vicinity of the box was insufficient, without more, to establish that she—as opposed to Millett—constructively possessed the cocaine. We disagree.

Here, the evidence at trial established that the van in which the cocaine was found was registered to the defendant, and that the defendant was a passenger in the vehicle. The only other adult in the vehicle was not a stranger but was, rather, someone with whom the defendant was intimately familiar. According to the information the defendant provided to Cooper, the family had been visiting not unknown persons but, rather, her friends and family. The cocaine was found inside an unlocked box within the defendant's reach from the passenger seat, near the defendant's children and her purse. Although there was evidence demonstrating that the box containing the cocaine was hidden underneath a jacket or blanket, there is no evidence to suggest that anyone placed it in the defendant's vehicle unbeknownst to her. Further, McAulay testified that the defendant behaved unusually during the stop by failing to acknowledge his presence, and by failing to interject herself into the conversation between Millett and McAulay when Millett was struggling to remember details about their trip.

Based upon this evidence, and all reasonable inferences from it in the light most favorable to the State, a rational trier of fact could conclude beyond a reasonable doubt that the defendant knew of the presence of the cocaine within the van and constructively possessed it. See State v. Tabaldi, 165 N.H. 306, 316 (2013) (evidence sufficient to establish constructive possession when drugs found inside cigarette box "in a location over which the defendant could exercise dominion and control" and defendant's bag was located nearby). "Personal possessions of the defendant found in close proximity to the controlled substance may provide a sufficiently close nexus between the defendant and the substance to allow the jury to infer possession." Id. (quotation and brackets omitted). Although a rational trier of fact could have also concluded that Millett constructively possessed the drugs, the State did not need to prove that the defendant's constructive possession of the cocaine was exclusive. See State v. Saide, 114 N.H. 735, 739 (1974).

The defendant next argues that there was insufficient evidence that she intended to distribute the cocaine. Because the defendant concedes that she did not raise this argument before the trial court, we consider this argument under the plain error rule. See Sup. Ct. R. 16-A; State v. Russell, 159 N.H. 475, 489 (2009). "Under the plain error rule, we may consider errors not

9

raised before the trial court." State v. Houghton, 168 N.H. 269, 273 (2015) (quotation omitted). "However, the rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result." Id. (quotation omitted). "To find plain error: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." Id. (quotation omitted).

In order to sustain a conviction for possession of a controlled substance with intent to sell or distribute, see RSA 318-B:2, I, the State was required to prove, among other things, that the defendant intended to sell or give the drug to another person. State v. Grote, 127 N.H. 748, 750 (1986) (applying prior version of statute). Citing only the evidence presented by the State relating to her demeanor, the defendant argues that there was insufficient evidence of her intent to sell or distribute. However, here, the evidence of the defendant's intent was not limited to her demeanor. Other evidence of the defendant's intent to sell or distribute included the circumstances surrounding her constructive possession of approximately 2.88 ounces of cocaine. According to McAulay, that amount is "much more than what [is] typically see[n] for . . . someone that uses cocaine for their own habit." Further, the cocaine was found inside a box that contained $1,930 in cash. From this evidence, a rational trier of fact could conclude beyond a reasonable doubt that the defendant intended to sell or distribute the cocaine. Cf. id. (evidence sufficient to establish intent to sell when drugs found along with notebook with calculations, address book, and large sum of cash); United States v. Rains, 615 F.3d 589, 594 (5th Cir. 2010) (evidence sufficient to establish intent to sell when drugs found, along with $3,000, in an amount "much more than a normal amount for daily personal use"). Accordingly, we conclude that the trial court did not err in finding sufficient evidence that the defendant possessed cocaine with intent to sell or distribute, and, therefore, the defendant has failed to meet the first prong of the plain error test. See State v. Moussa, 164 N.H. 108, 129 (2012).

Because the defendant's sufficiency challenge fails, and therefore retrial is not precluded under the double jeopardy doctrine, we remand for further proceedings consistent with this opinion.

Reversed and remanded.

DALIANIS, C.J., and CONBOY and BASSETT, JJ., concurred; HICKS, J., concurred specially.

HICKS, J., concurring specially. The majority applies the three-part test we articulated in State v. McKinnon-Andrews, 151 N.H. 19, 25 (2004), for determining whether a police officer's questioning exceeds the scope of a lawful traffic stop. Applying this test, the majority holds that McAulay impermissibly

expanded the scope of the traffic stop by requesting a canine unit to perform a sniff of the vehicle. While I agree with the majority that the evidence obtained as a result of the subsequent consent search must be suppressed, I write separately because I would apply the third prong of the McKinnon-Andrews test differently than the majority.

Consistent with the majority opinion, I believe that the first two prongs of the McKinnon-Andrews test were not satisfied in the instant case. McAulay's request for a canine unit was not reasonably related to the initial justification for the stop. Cf. id. at 25 (holding officer's question regarding contents of defendant's vehicle not reasonably related to purpose of traffic stop). Additionally, it was not based upon any reasonable suspicion that arose before McAulay made the request. See State v. Blesdell-Moore, 166 N.H. 183, 185, 189 (2014) (defendant's nervousness, trembling hands, and bloodshot eyes did not justify questioning about drug use); Viveros v. State, 828 S.W.2d 2, 4 (Tex. Crim. App. 1992) (en banc) (although officer considered defendant's behavior to be "unusual," officer lacked reasonable suspicion when there was no indication that the unusual activity was related to crime).

The third prong of the test requires consideration of whether "in light of all the circumstances, the question impermissibly prolonged the detention or changed its fundamental nature." McKinnon-Andrews, 151 N.H. at 25. This prong is dual-faceted; one facet relates to the length of the detention, and the other relates to the nature of the stop. The majority relies on the facet relating to the length of the detention, concluding that McAulay "prolonged the stop without a proper basis for doing so." With much respect for the majority, I would rely upon the facet of the third prong relating to the nature of the stop given the facts of this case. I believe that a sounder rationale for concluding that the third prong of the test was not satisfied is that the request for a canine unit "changed the fundamental nature of the stop." Id.

In my view, the traffic stop was transformed into an investigation of criminal activity relating to the possession of contraband, at the latest, when McAulay requested a canine unit. By making this request, he plainly sought to determine whether Millett and the defendant possessed illegal drugs or some other form of contraband. A reasonable motorist in Millett's position would understand that this request altered the fundamental nature of the stop. See Blesdell-Moore, 166 N.H. at 190 (considering perception of reasonable motorist); McKinnon-Andrews, 151 N.H. at 28-29 (Broderick, J., concurring specially) (concluding that officer's question regarding contents of vehicle altered fundamental nature of traffic stop based, in part, upon reasonable motorist's perception). An investigation into the possession of contraband is fundamentally different from an investigation of traffic violations, such as the misuse of plates and improper child restraints at issue here—or even an investigation of potential kidnapping, which the State claims was justified by reasonable suspicion. Further, as the majority notes, McAulay "had already

11

satisfactorily resolved the license plate issue that provided the initial justification for the stop."

For these reasons, I believe that the stop metamorphosed into an overly intrusive detention, at the latest, by the time McAulay requested the canine unit. <u>See</u> <u>Blesdell-Moore</u>, 166 N.H. at 187. Thus, I would hold that McAulay's request for a canine unit "changed the fundamental nature of the stop." <u>McKinnon-Andrews</u>, 151 N.H. at 25.