NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Strafford
No. 2016-0235

THE STATE OF NEW HAMPSHIRE

v.

ANDREW ROBBINS

Argued: June 1, 2017
Opinion Issued: September 21, 2017

Joseph A. Foster, attorney general (Scott D. Chase, attorney, and Stephen D. Fuller, assistant attorney general, on the brief, and Mr. Chase orally), for the State.

Christine C. List, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

LYNN, J. The defendant, Andrew Robbins, appeals his conviction for being a convicted felon in possession of a deadly weapon. See RSA 159:3 (2014). He argues that the Superior Court (Howard, J.) erroneously denied his motion to suppress evidence obtained as a result of his arrest following a traffic stop of a vehicle in which he was a passenger. We affirm.

The pertinent facts are as follows. On April 26, 2015, at approximately 10:30 p.m., Officer Moore of the Rochester Police Department observed a Toyota Camry traveling down the center of Chestnut Street, a two-way road, in Rochester. See RSA 265:16 (2014) (requiring vehicles to drive on right side of roadway). Moore also observed the vehicle fail to make a complete stop at a stop sign. See RSA 265:31, II (2014) (requiring vehicles to make a complete stop at a stop sign). The officer followed the vehicle and engaged his emergency lights, and the vehicle pulled to the side of the road and stopped.

Upon approaching the vehicle, Moore immediately recognized three of the four occupants from prior traffic stops: the driver, Haley Cahill; the front passenger, Felix Urrutia; and the rear left-side passenger, Amanda Ableman. Moore knew both Cahill and Urrutia were members of a national criminal street gang known as the "Bloods." Moore observed that Cahill and Urrutia were dressed in red, a color affiliated with the gang. Moreover, Moore observed that the defendant, the rear right-side passenger, was wearing a red shirt and red bracelets. The defendant's clothing, in addition to his association with Cahill and Urrutia, indicated to Moore a potential affiliation with the Bloods. From his training, Moore knew that members of the Bloods are known to act aggressively or violently during interactions with police, especially when new to the gang. Neither Cahill nor Urrutia had acted violently towards Moore during his prior interactions with them. However, Moore was aware that Urrutia had resisted arrest by Rochester police on a prior occasion. Moore was concerned for his safety because of these observations, his preexisting knowledge of the occupants' past behavior and gang affiliation, the time of night, and the number of occupants in the vehicle.

After obtaining Cahill's driver's license, Moore, in accordance with what he described as his regular practice, requested the name and date of birth of each passenger. It took Moore less than one minute to obtain them. Moore then returned to his cruiser and checked each of the occupants' names and dates of birth through a computer system that allows an officer to determine whether a warrant has been issued for a person's arrest. This check, which lasted less than three minutes, revealed that an arrest warrant had been issued for the defendant. Because the warrant was not an electronic bench warrant, Moore confirmed with a dispatcher that a copy of the warrant was at the Rochester police station. The warrant confirmation process took an additional three to five minutes.

After confirming the warrant, Moore approached the vehicle and asked the defendant to step out. He then informed the defendant of the warrant and placed him under arrest. After Moore placed the defendant under arrest, he searched the defendant and found a knife in his right front pocket.

Subsequently, the defendant was charged with one count of being a felon in possession of a deadly weapon.  See RSA 159:3.  Prior to trial, the defendant moved to suppress the knife, arguing that Moore unlawfully expanded the scope and duration of the stop by requesting each passenger's name and date of birth and subsequently running a warrant check on each individual.  Following an evidentiary hearing, the trial court denied the defendant's motion, ruling that Moore's request for personal information and warrant check were justified because he had a reasonable, articulable suspicion of danger and concern for his safety.  Following a bench trial, the trial court found the defendant guilty.  This appeal followed.

II

On appeal, the defendant argues that Moore unlawfully expanded the scope of the traffic stop by questioning him and conducting a warrant check.  The defendant asserts that this unjustified expansion of the scope of the traffic stop violated his rights to be free from unreasonable seizures under Part I, Article 19 of the State Constitution.  Because the defendant asserts a violation of his rights only under the New Hampshire Constitution, we limit our review to that claim and rely upon federal law merely to aid our analysis.  See State v. Dewitt, 143 N.H. 24, 33 (1998).  "When reviewing a trial court's order on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous, and we review legal conclusions de novo."  State v. Blesdell-Moore, 166 N.H. 183, 187 (2014).

The defendant advances three arguments in support of his position that we should reverse the trial court's order.  First, he contends that we should decline to adopt a "bright line" rule, as advocated by the State, that would permit the police to request the identification of passengers as a matter of course during any traffic stop.  Second, he asserts that Moore's request for identification and his subsequent warrant check were not supported by a reasonable, articulable suspicion of danger sufficient to justify an objectively reasonable concern for officer safety.  Finally, he contends that Moore's questioning impermissibly prolonged the duration of the stop and fundamentally transformed its nature into an investigation of criminal activity.  Because we conclude that Moore's request for passenger identification was based upon an objectively reasonable concern for his safety, we find it unnecessary to address the defendant's first and third arguments.[1]

---

[1] With respect to the defendant's third argument, we note that his assertion that the stop was improperly prolonged and its fundamental nature changed is based entirely upon the claim that Moore acted unlawfully simply by requesting passenger identifications and conducting the warrant checks.  He makes no independent argument that, if the identifications and warrant checks were not unreasonable, the manner in which Moore carried out these activities was itself improper or had the effect of prolonging the stop for a time greater than reasonably necessary to complete these activities.  Therefore, because we find that there were reasonable grounds for the identifications and warrant checks, the defendant's third argument affords no basis for granting him relief.

"Part I, Article 19 of the New Hampshire Constitution protects all people, their papers, their possessions and their homes from unreasonable searches and seizures." Id. at 187 (quotation omitted). "Evidence obtained in violation of a defendant's rights under Part I, Article 19 of the State Constitution is inadmissible under the exclusionary rule, though an exception to this rule may apply if the State proves that the taint of the primary illegality is purged." Id.

During a traffic stop, both the driver and passengers in the vehicle are seized for constitutional purposes. See Brendlin v. California, 551 U.S. 249, 263 (2007); State v. Pellicci, 133 N.H. 523, 528 (1990). "The scope of such an investigative stop must be carefully tailored to its underlying justification, must be temporary, and last no longer than is necessary to effectuate the purpose of the stop." Blesdell-Moore, 166 N.H. at 187 (quotation and brackets omitted). "The scope of a stop may be expanded to investigate other suspected illegal activity only if the officer has a reasonable and articulable suspicion that other criminal activity is afoot." Id. (quotation omitted). "An investigatory stop may metamorphose into an overly prolonged or intrusive detention (and, thus, become unlawful)." Id. (quotation omitted). "Whether the detention is a lawful investigatory stop, or goes beyond the limits of such a stop, depends upon the facts and circumstances of the particular case." Id.

In State v. McKinnon-Andrews, 151 N.H. 19 (2004), we adopted a three-part test for determining whether questioning during a traffic stop is permissible. See McKinnon-Andrews, 151 N.H. at 25. Under this test, to determine whether the scope of an otherwise valid stop has been exceeded by questioning, we examine: (1) whether the question is reasonably related to the initial justification for the stop; (2) whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question; and (3) whether in light of all the circumstances, the question impermissibly prolonged the detention or changed its fundamental nature." Id. "If the question is reasonably related to the purpose of the stop, no constitutional violation occurs." Id. (quotation and brackets omitted). "If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question." Id. (quotation omitted). "If the question is so justified, no constitutional violation occurs." Id. (quotation and brackets omitted). "In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop." Id. (quotation omitted).[2]

_____

[2] When we adopted this three-part test in McKinnon-Andrews, we relied upon the decision of the Illinois Supreme Court in People v. Gonzalez, 789 N.E.2d 260 (Ill. 2003), which utilized this test. We note, however, that, subsequent to our decision in McKinnon-Andrews, the Illinois Supreme Court, in People v. Harris, 886 N.E.2d 947 (Ill. 2008), overruled Gonzalez on the grounds that the

4

We have explained that reasonable, articulable suspicion refers to suspicion based upon specific, articulable facts, taken together with rational inferences from those facts, that the particular person stopped has been, is, or is about to be, engaged in criminal activity. See id. at 25-26. "To determine the sufficiency of an officer's suspicion, we consider the articulable facts in light of all surrounding circumstances, keeping in mind that a trained officer may make inferences and draw conclusions from conduct that may seem unremarkable to an untrained observer." Id. at 26. "A reasonable suspicion must be more than a hunch." Id. "The articulated facts must lead somewhere specific, not just to a general sense that this is probably a bad person who may have committed some kind of crime." Id. (quotation omitted). "The officer's suspicion must have a particularized and objective basis in order to warrant that intrusion into protected privacy rights." Id.

In this case, the trial court relied upon the following factors to support its finding that Moore had a reasonable, articulable suspicion of danger to his safety sufficient to justify his asking for identification of the vehicle occupants and conducting warrant checks: the late hour, the number of occupants in the vehicle, their suspected gang affiliation, and Urrutia's prior episode of resisting arrest. The defendant contends that this combination of factors does not rise to the level of reasonable suspicion sufficient to justify Moore's actions. We disagree. In addressing the defendant's argument, we observe initially that, assuming Moore had a reasonable concern for his safety, his actions in requesting identification and conducting warrant checks of the vehicles' occupants unquestionably constitute a proper means of addressing such concerns, and thus, at a minimum, satisfy the second prong of the McKinnon-Andrews test. See United States v. Rice, 483 F.3d 1079, 1084 (10th Cir. 2007) ("While a traffic stop is ongoing . . . an officer has wide discretion to take reasonable precautions to protect his safety. . . . [A]n officer may ask for identification from passengers and run background checks on them as well." (citations omitted)); see also Maryland v. Wilson, 519 U.S. 408, 414-15 (1997) (holding that safety concerns provide reasonable justification for officer making traffic stop to order passengers to step out of vehicle).

Here, it was late at night — approximately 10:30 p.m. — when Moore pulled the vehicle over. Moore was alone and outnumbered four to one by the occupants of the vehicle, two of whom he knew to be members of the Bloods gang, and a third whom he suspected to be affiliated with the gang. Although the known Bloods members, Cahill and Urrutia, had never acted violently during their previous encounters with Moore himself, the officer was aware of

inquiry into whether the questioning "changed the fundamental nature of the stop" is inconsistent with subsequent U.S. Supreme Court cases, which make clear that the scope of police questioning has a bearing on the lawfulness of a traffic stop only if its effect is to prolong the duration of the stop. See Harris, 886 N.E.2d at 958-61. Because no party has asked us to reconsider McKinnon-Andrews, it continues to provide the governing legal standard by which this case should be decided.

Urrutia's resisting arrest charge arising from an encounter with another officer. Moore testified that, when he observed the passengers in the vehicle, particularly Urrutia, he feared that he may be in danger. Additionally, Moore suspected that, because he had never encountered the defendant before, he was an initiate to the gang. Moore knew from his police training that new members of the Bloods tend to act more violently, especially towards law enforcement, to prove themselves to the gang.

Based upon the totality of the above facts and circumstances, we conclude that the trial court did not err in finding that Moore had a reasonable, articulable concern for his safety sufficient to justify his actions in requesting the identification of the vehicle's passengers and conducting warrant checks on these individuals. See United States v. Tiru-Plaza, 766 F.3d 111, 113, 121 (1st Cir. 2014) (concluding that officers conducting a traffic stop had an objectively reasonable concern for their safety so as to justify a frisk search of the vehicle's passengers where the vehicle was stopped at night, officers were outnumbered four to two, and the officers learned that the driver had a gun); United States v. Guardado, 699 F.3d 1220, 1223 (10th Cir. 2012) (stating that gang affiliation, as indicated by a defendant's clothing, can support the reasonableness of an officer's suspicion of criminal activity); see also Arizona v. Johnson, 555 U.S. 323, 330 (2009) (noting that traffic stops are "especially fraught with danger to police officers" (quotation omitted)); State v. Smith, 141 N.H. 271, 276 (1996) ("Our constitution should not be interpreted to deny police officers the right to protect themselves from harm.").

Affirmed.

DALIANIS, C.J., and HICKS and BASSETT, JJ., concurred.